UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LARRY NAQUIN, SR.                         CIVIL ACTION


VERSUS                                    NO: 10-4320


ELEVATING BOATS, LLC AND                  SECTION: J(4)
TECHCRANE INTERNATIONAL, LLC


## ORDER AND REASONS

This matter is before the Court on a series of post-trial motions filed by Defendant Elevating Boats, L.L.C. ("EBI") following an adverse jury verdict at trial.  In particular, EBI moves for judgment as a matter of law, or alternatively, for a new trial on the issues of seaman status (**Rec. Doc. 126)** and future lost wages **(Rec. Doc. 133)**.  EBI also moves for a new trial, or alternatively, for remittitur on the issues of general damages **(Rec. Doc. 134)** and past lost wages **(Rec. Doc. 135)**.

### PROCEDURAL HISTORY AND BACKGROUND FACTS

Defendant EBI is a company whose principal business operations involve the design and manufacture of lift boats and marine

1

pedestal cranes for sale and use in maritime commerce.[1]   EBI also operates a fleet of lift boats for charter for offshore work in the Gulf of Mexico.   In support of these operations, EBI maintains a lift boat and pedestal crane inspection and repair facility in Houma, Louisiana, where Plaintiff Larry Naquin, Sr. ("Plaintiff") has worked in various capacities since January 10, 1997.   At the time he was originally hired, Plaintiff worked as a fitter/welder, performing precision cutting in the vessel fabrication building at EBI's Houma facility.   He held this position for approximately two years, at which time he was promoted to the role of construction foreman.  As a construction foreman, he oversaw the construction of lift boat hulls and managed a small team of repair technicians, including welders, painters, electricians, and carpenters.  Shortly after Hurricane Katrina, Plaintiff assumed the position of repair supervisor, which he held until the events giving rise to the instant lawsuit.   In his capacity as a repair supervisor, Plaintiff oversaw the inspection, repair, and servicing of EBI's fleet of lift boats and cranes, as well as those that were owned by other companies who contracted with EBI for such services.

On November 17, 2009, Plaintiff was operating one of EBI's land-based cranes in order to move a thirty-ton test block from a trailer to its normal storage location.   Before he was able to complete the move, however, the crane's pedestal snapped and

---

[1] The facts of this case are more fully presented in the Court's January 3, 2012 Order and Reasons denying EBI's Motion for Summary Judgment **(Rec. Doc. 51)**.

separated, sending the crane's boom toppling into an adjacent building and killing another EBI employee, who was Plaintiff's cousin's husband.  Plaintiff suffered injuries to both his left ankle and right heel as a result of the accident and required surgery.

Plaintiff filed suit against EBI on November 15, 2010, asserting claims under the Jones Act, and in the alternative, reserving his claims and benefits under the Longshore & Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, et seq. Plaintiff also sued Techcrane, International, L.L.C. ("Techcrane"), a company believed by Plaintiff to work with EBI to supply, design, and/or construct EBI cranes.  On September 13, 2011, Techcrane filed a motion for summary judgment, arguing that there was no evidence that it had designed, manufactured, or in any way assumed responsibility for the crane at issue in this case.[2]  The Court agreed and granted the motion on the same day.[3]  Subsequently, on October 24, 2011, EBI moved for summary judgment, arguing that the undisputed evidence demonstrated that Plaintiff was not a Jones Act seaman as a matter of law.[4]  The Court issued written Order and

_____

[2] Rec. Doc. 33.  Techrane also concurrently moved for sanctions, which the Court denied.  Rec. Docs. 32, 34.

[3] Rec. Doc. 34.

[4] Rec. Doc. 40.

Reasons denying the motion on January 3, 2012.[5]  The case came on for trial before a jury on May 14, 2012.[6]  After a three-day trial, the jury returned its verdict, finding that Plaintiff was a seaman, that EBI had been negligent, and that its negligence was the cause of Plaintiff's injuries.[7]

The jury awarded Plaintiff a total of $2,560,000.00 in damages, in the following specific categories:  $160,000.00 in past lost wages; $400,000.00 in future lost wages; $600,000.00 in past mental and emotional suffering; $400,000.00 in future mental and emotional suffering; $300,000.00 in past physical pain and suffering; and $700,000.00 in future physical pain and suffering.[8] The Court entered judgment in accordance with the jury's verdict on May 18, 2012.[9]  The parties then jointly moved to amend the judgment with respect to the award for past lost wages to reflect a credit to EBI in the amount of $89,600.00 for payments made to Plaintiff pursuant to the LHWCA.  The Court granted the motion and

---

[5]  Rec. Doc. 51.  The Court found that Plaintiff had introduced evidence sufficient to create a genuine issue of material fact as to whether he satisfied the two-prong test for seaman status articulated by the United States Supreme Court in <u>Chandris v. Latsis</u>, 515 U.S. 347 (1995), thereby precluding summary judgment.  <u>Id.</u> at pp. 10-21.

[6]  At the close of Plaintiff's evidence, EBI orally moved for judgment as a matter of law on the issues of seaman status, liability, future lost wages, and future medical expenses.  Rec. Doc. 114.  The Court denied the motion for judgment as a matter of law on the issue of liability, granted the motion for judgment for judgment as a matter of law on the issue of Plaintiff's future medical expenses, and deferred ruling on the remaining motions.  Rec. Docs. 114, 116.

[7]  Rec. Doc. 116-4.

[8]  Rec. Doc. 116-4.

[9]  Rec. Doc. 118.

4

concurrently entered an amended judgment reducing the total past lost wages award to $70,400.00 and discharging any lien EBI may be entitled to assert based on previously paid LHWCA benefits.[10]   The instant motions followed soon thereafter.

## LEGAL STANDARD

### A.  Motion for Judgment as a Matter of Law

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." Harrington v. Harris, 118 F.3d 359, 367 (5th Cir. 1997).  Under the standards established by Rule 50 of the Federal Rules of Civil Procedure, a court may grant judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a).  In general, a legally sufficient evidentiary basis does not exist where "the facts and inferences point so strongly and overwhelmingly in favor of one party that . . . reasonable men could not arrive at a contrary verdict." Brown v. Bryan Cnty., 219 F.3d 450, 456 (5th Cir. 2000) (quoting Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), overruled on other grounds, Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997) (en banc)).  In deciding a motion for judgment as a matter of law, a district court must

---

[10]  Rec. Docs. 120, 121.

5

consider the evidence in the light most favorable to the party opposing the motion. Brown, 219 F.3d at 456 (citing Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 993 (5th Cir.1996)). Because credibility determinations, weighing evidence, and drawing reasonable inferences in light of common experience are functions best left to the jury, courts should generally be "especially deferential" to a jury's findings. DP Solutions, Inc. v. Rollins, Inc., 353 F.3d 421, 427 (5th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)); Brown, 219 F.3d at 456.

Additionally, in Jones Act cases, a more stringent standard must be satisfied before a court will disturb a jury's findings based on a challenge to the sufficiency of the evidence. See Hughes v. Int'l Diving & Consulting Servs., Inc., 68 F.3d 90, 93 (5th Cir. 1995) (per curiam). Under this standard, "judgment as a matter of law on a Jones Act count is appropriate only when there is a complete absence of probative facts supporting the nonmovant's position." Id. (citing Lavender v. Kurn, 327 U.S. 645, 653 (1946)). "This standard is highly favorable to the plaintiff," requiring courts "to validate the jury verdict if at all possible." Id.

**B.  Motion for New Trial**

Rule 59 of the Federal Rules of Civil Procedure provides the standard governing motions for a new trial. The rule does not specify the precise grounds that are necessary to grant a new

trial, but merely states that "[a] new trial may be granted for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a).  A new trial may be granted "if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." Smith v. Transworld Drilling Co., 773 F.2d 610, 612 (5th Cir. 1985) (citations omitted).  In considering a Rule 59(a) motion based on evidentiary grounds, a court may weigh all the evidence in the record and need not view it in the light most favorable to the non-movant.  Id. at 613.  While a court should "respect the jury's collective wisdom and must not simply substitute its opinion for the jury's," if a district judge is dissatisfied with the jury's verdict, he has both the right and also the duty to set aside the verdict and order a new trial.  Id.

## C. Remittitur

Depending on the circumstances of the case, a district court has the option of either granting a new trial or a remittitur on the issue of damages.  See Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 178 (5th Cir. 1992).  "[W]hen a jury verdict results from passion or prejudice, a new trial, not remittitur is the proper remedy."  Id.  However, a damage award that exceeds the "bounds of any reasonable recovery" is properly corrected through remittitur, rather than a new trial.  Id.  A court should not disturb a jury's

damages award unless it is "entirely disproportionate to the injury sustained." <u>Simeon v. T. Smith & Son, Inc.</u>, 852 F.2d 1421 (5th Cir. 1988) (quoting <u>Caldarera v. Eastern Airlines, Inc.</u>, 705 F.2d 778, 784 (5th Cir. 1983)). If the jury's award is unacceptably disproportionate, either the district or appellate court should reduce the award to "the maximum amount the jury could properly have awarded." <u>Brunnemann</u>, 975 F.2d at 178; <u>Simeon</u>, 852 F.2d at 1426 (quoting <u>Caldarera</u>, 705 F.2d at 784). The Fifth Circuit has long recognized that because pain and suffering are largely insusceptible to monetary quantification, the jury necessarily enjoys especially broad leeway in making general damage awards. <u>Simeon</u>, 852 F.2d at 1427.

## DISCUSSION

**A.  EBI's Motion for Judgment as a Matter of Law, or Alternatively, for a New Trial on the Issue of Seaman Status**

In support of its first motion, EBI argues that the record contains no sufficient evidentiary basis from which the jury could permissibly find Plaintiff to be a Jones Act seaman. According to EBI, the totality of the evidence concerning the nature of Plaintiff's employment shows that he was a land-based repairman who cannot be a seaman as a matter of law. In response, Plaintiff contends that the record in this case contains sufficient evidence to support the jury's determination that Plaintiff was a seaman.

8

On balance, the Court finds that Plaintiff has the better argument. The Court has previously considered and rejected the majority of the arguments presented in the instant motion when it denied EBI's motion for summary judgment on the issue of seaman status.[11] EBI does not contend that the evidence presented at trial with regards to the nature of Plaintiff's employment differs in any significant respect from that which was presented at the summary judgment stage, and in fact, appears to acknowledge that its motion relies largely on the same evidence the Court previously considered in denying the aforementioned summary judgment motion. See Memorandum in Support, Rec. Doc. 126-1, p. 11 ("Therefore, the following argument relies heavily on the evidence already in the record prior to trial, all of which was covered during the direct and cross examination of the witnesses . . .") (emphasis in original). In its Order and Reasons dated January 3, 2012,[12] the Court found this same evidence sufficient to create a jury question with regards to the issue of Plaintiff's status, and the Court finds no compelling reason to depart from this conclusion at the present time. See Green v. Adm'rs of Tulane Educ. Fund, No. 97-1869, 2000 WL 341027, at *3 (E.D. La. Mar. 30, 2000) (denying Rule 50 motion that primarily reiterated the same arguments raised in prior motion for summary judgment), aff'd, 284 F.3d 642 (5th Cir.

---

[11]  Rec. Doc. 51.

[12]  Rec. Doc. 51.

2002).[13]  Accordingly, EBI's motion for judgment as a matter of law, or alternatively, for a new trial on the issue of seaman status will be denied.

**B.  EBI's Motion for Judgment as a Matter of Law, or Alternatively, for a New Trial on the Issue of Future Lost Wages**

In its second motion, EBI moves for judgment as a matter of law, or alternatively, for a new trial on the issue of Plaintiff's future lost wages.  As previously noted, the jury returned a verdict awarding Plaintiff $400,000 in future lost wages.  EBI asserted as an affirmative defense that Plaintiff failed to mitigate his damages and is thereby precluded from recovering *any* future lost wage award whatsoever.[14]

In particular, EBI argues that the evidence in this case overwhelmingly shows that: (1) Plaintiff was capable of performing sedentary work; (2) EBI offered Plaintiff a sedentary position at EBI with the same hours and at the same salary as his pre-injury position approximately six months before this litigation was instituted; and (3) Plaintiff failed to accept EBI's offer.  Based on the foregoing, EBI requests that the Court vacate the jury's

---

[13]  As the Court previously explained in its Order and Reasons denying EBI's motion for summary judgment, the evidentiary showing necessary to create a jury question on the issue of seaman status is very low.  <u>See</u> <u>Bernard v. Binnings Constr. Co., Inc.</u>, 741 F.2d 824, 827 (5th Cir. 1984) (citing <u>Leonard v. Exxon Corp.</u>, 581 F.2d 522 (5th Cir. 1978)) ("[S]ubmission of Jones act claims to a jury requires a very low evidentiary threshold; even marginal claims are properly left for jury determination.").

[14]  Answer, Rec. Doc. 4, p. 2.

verdict with respect to the future lost wages and enter judgment as a matter of law in its favor.  In response, Plaintiff contends that the jury was well within its discretion to reject EBI's affirmative defense and impose a future lost wages award based on the evidence in the record, most notably the testimony of Plaintiff's vocational expert regarding his future employability, as well as Plaintiff's own testimony regarding his injuries and emotional difficulties suffered as a result of the accident.

A Jones Act seaman, like other tort victims, has a duty to mitigate his damages, and his recovery will be reduced to the extent that his losses are enhanced by unreasonable conduct.  See Williams v. Reading & Bates Drilling Co., 750 F.2d 487, 490 (5th Cir. 1985).  The duty to mitigate damages encompasses an obligation to exercise reasonable diligence to seek alternative employment. See Earl v. Bouchard Transp. Co., Inc., 735 F. Supp. 1167, 1173 (E.D.N.Y. 1990); Burden v. Evansville Materials, Inc., 636 F. Supp. 1022 (W.D. Ky. 1986), aff'd, 840 F.2d 343 (6th Cir. 1988).  Whether an injured party has discharged this duty "requires a factual assessment of the reasonableness of his conduct," which is a determination generally best left to the jury.  Hill v. City of Pontotoc, Miss., 993 F.2d 422, 427 (5th Cir. 1993) (citing Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1476 (5th Cir. 1991)); Sellers v. Delgado College, 902 F.2d 1189 (5th Cir. 1990).  Because failure to mitigate damages is an affirmative defense, EBI bears the burden of proof and must have established

11

(1) that Plaintiff's conduct after the accident was unreasonable and (2) that his unreasonable conduct had the consequence of aggravating the harm. <u>Marathon Pipe Line Co. v. M/V Sea Level II</u>, 806 F.2d 585, 592 (5th Cir. 1986) (citing <u>Tenn. Valley Sand & Gravel Co. v. M/V DELTA</u>, 598 F.2d 930, 933 (5th Cir. 1979)).

Motions for judgment as a matter of law are rarely granted in favor of the party bearing the burden of proof on an issue. <u>See Jefferson Amusement Co. v. Lincoln Nat'l Life Ins. Co.</u>, 409 F.2d 644, 651 (5th Cir. 1969); <u>see also</u> 9B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2535, at 526-527 (3d ed. 2008) ("[C]ourts often caution that granting a judgment as a matter of law for the party bearing the burden of proof is reserved for extreme cases."). In such cases, a court should only grant judgment as a matter of law where, "on the entire record construed in the light most favorable to the nonmoving party," the evidence is "so overwhelmingly in favor of the moving party that no reasonable jury could have arrived at the disputed verdict." <u>Long v. Shultz Cattle Co.</u>, 881 F.2d 129, 132 (5th Cir. 1989); <u>see also</u> 9B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2535, <u>supra</u>, at 527 (explaining that the party with the burden of proof must have "established the elements of its case by testimony that the jury is not at liberty to disbelieve" before judgment as a matter of law may be granted in its favor).

Applying the foregoing standard to the facts of this case, the Court is not persuaded that the evidence, when viewed in the light

12

most favorable to Plaintiff, weighs so overwhelmingly in EBI's favor that the jury could not have reasonably rejected its affirmative defense and awarded Plaintiff future lost wages. Even accepting that EBI offered Plaintiff the opportunity to return to work in a sedentary "data input" position, there is evidence in the record from which the jury could reasonably conclude that Plaintiff was neither physically nor emotionally capable of performing this job or any other job as a result of the accident. Plaintiff's vocational expert, Dr. Cornelius "Neal" Gorman, opined at trial that Plaintiff would likely be unable to ever gain meaningful employment in any type of position in the future as a result of his accident.[15] On cross-examination, EBI's counsel also asked Dr. Gorman whether he knew EBI had offered to re-employ Plaintiff in a desk job involving primarily sedentary duties. In response to these questions, Dr. Gorman reasserted his belief that Plaintiff was "not competitively employable in any capacity" based on his physical limitations, his "significant" emotional upset, advanced age, and level of education.[16] In addition, the Plaintiff testified that the chronic physical pain and considerable emotional difficulties he experienced as a result of his injuries and the

---

[15]  See Rec. Doc. 141-1, p. 4:

> Q: Your opinion is that in all likelihood . . . there are no future jobs available for this man; is that correct?
>
> A: Unfortunately that is true.

[16]  Rec. Doc. 141-1, p. 5.

accident hampered his ability to perform even sedentary work. Specifically, Plaintiff testified that he continues to experience chronic pain in both feet, his back, and his knee as a result of the accident, and that the pain in his feet persists regardless of whether or not he is sitting.  Plaintiff also described to the jury the considerable emotional difficulties he experienced as a result of the accident, including depression, guilt, feelings of alienation, and thoughts of suicide, all of which prompted him to seek treatment from a licensed social worker.[17]  Plaintiff testified that these emotional problems, coupled with his physical pain, hampered his ability to perform even sedentary work.

In considering whether a party is entitled to an award of damages based on future loss of earnings, a jury may consider his ability to mitigate his damages, as well as other factors that may prevent him from obtaining work in the future.  See Bartholomew v. CNG Producing Co., 832 F.2d 326, 331 (5th Cir. 1987).   In making this assessment, a jury may consider the party's physical and emotional condition in light of the accident on which the suit is based.  See O'Shea v. Riverway Towing Co., 677 F.2d 1194, 1197 (7th Cir. 1982) (noting that, with respect to a future lost wages award, the question is whether the plaintiff could "find gainful employment, *given the physical condition in which the accident left her*"); Baker v. Baltimore & Ohio R.R. Co., 502 F.2d 638, 644 (6th

---

[17]  Rec. Doc. 140-1, pp. 12-13.

Cir. 1974) (in considering issues of mitigation of damages and loss of future earnings, a jury may consider "the extent of Plaintiff's injuries, his education, station in life, and character") (emphasis added).  If there is sufficient evidence showing that the party was unable to reasonably mitigate his damages through alternative employment because of his injuries, then the jury's verdict should not be disturbed.  See, e.g., DeBiasio v. Ill. Cent. R.R., 52 F.3d 678, 688 (7th Cir. 1995) (affirming district court's denial of defendant's motions for judgment as a matter of law, for new trial, or for remittitur on future lost wages award and explaining that although plaintiff had a duty to mitigate his damages, the evidence showed that the only jobs available to him were jobs "which he would have been emotionally unable to handle"); England v. Mack Trucks, Inc., No. 07-5169, 2008 WL 168689, at *3-*4 (W.D. Wash. Jan. 16, 2008) (plaintiff's testimony that he was unable to accept a job his doctor had medically authorized him to accept because it would require a long commute that would be painful on his injured knee was sufficient to create a jury question with regards to mitigation of damages); see also Williams, 750 F.2d at 490 (affirming district court's refusal to require injured seaman to attempt to return to his former employment in an effort to mitigate damages where seaman was likely to suffer adverse health effects if he resumed his previous position).

Here, based on the evidence described above, the Court finds that the jury could have  reasonably concluded that Plaintiff's

physical condition and emotional difficulties rendered him unable to perform even sedentary work, thereby limiting his ability to mitigate his damages.[18]  As EBI observes, there is testimony in the record that contradicts the above-described testimony of Plaintiff and Dr. Gorman.[19]  However, the Court is not convinced that the evidence, when viewed in its entirety, "weighs so heavily" in EBI's favor that the jury had no reasonable option but to find that EBI satisfied its burden of proof on its affirmative defense. Accordingly, EBI's motion for judgment as a matter of law, or alternatively, for a new trial on the issue of Plaintiff's future lost wages will be denied.

### C.   EBI's Motion for a New Trial, or Alternatively, for Remittitur on Issue of General Damages

---

[18]  It is also perhaps not insignificant that accepting the desk job EBI had reportedly offered would require Plaintiff to return to work for the same company at the same general facility where the accident occurred with the same coworkers. In light of Plaintiff's testimony regarding his difficulty coping with the emotional stress caused by the accident and his feelings of alienation from his coworkers, the jury could have drawn a reasonable inference that Plaintiff was simply emotionally unable to accept any further employment with the company, even if such were made available to him, or alternatively, that his choice to decline the offer of reemployment was a reasonable one.  A jury is permitted to draw such inferences from the evidence introduced at trial.  See Smith v. A.C. & S., Inc., 843 F.2d 854, 859 (5th Cir. 1988).

[19]  For instance, EBI attempts to minimize the significance of Dr. Gorman's testimony by pointing out that he had never reviewed Plaintiff's complete medical records or the results of his subsequent functional capacity evaluation before formulating his opinion.  It also points out that several physicians had. However, EBI's counsel elicited this information during the course of the trial, and the jury undoubtedly considered it in determining the proper weight to be assigned to Dr. Gorman's testimony.  See Whitehead v. Food Max of Miss., Inc., 163 F.3d 265, 273 (5th Cir. 1998) ("It is within the province of the jury to decide how much weight to give this expert testimony.") (citing Newport Ltd. v. Sears, Roebuck & Co., 6 F.3d 1058, 1069 (5th Cir. 1993)).

In its third motion, EBI moves for a new trial, or alternatively, for remittitur on the issue of general damages. On May 18, 2012, this Court entered judgment consistent with the jury's verdict awarding Plaintiff a total of $2,000,000 in general damages, consisting of $1,000,000 for past and future physical pain and suffering and $1,000,000 for past and future mental and emotional suffering.[20] Specifically, the jury allocated the awards as follows: $300,000 for past physical pain and suffering; $700,000 for future physical pain and suffering; $600,000 for past mental and emotional suffering; and $400,000 for future mental and emotional suffering.[21] On May 30, 2012, this Court entered an amended judgment which reduced Plaintiff's past lost wages award but left the jury's general damages award undisturbed.[22]

EBI asserts that it is entitled to a new trial on the issue of general damages or, alternatively, to a denial of a new trial conditioned on a remittitur, because the jury awarded excessive general damages. EBI does not expressly urge this Court to apply either the maximum recovery rule or the clearly excessive rule, instead arguing that regardless of which approach the Court uses, it is entitled to a new trial or, alternatively, a denial of a new trial conditioned on Plaintiff accepting a reduced general damage award of either $1,191,084 or $450,000. With respect to the jury's

---

[20] Rec. Doc. 116-4.

[21] Rec. Doc. 116-4.

[22] Rec. Doc. 120, 121.

award for past and future physical pain and suffering, EBI argues
that the award is clearly excessive, because Louisiana state and
federal cases indicate that past and future physical pain and
suffering awards for what are, according to EBI, comparable
physical injuries range between $194,000 and $444,000. With respect
to the jury's award for past and future mental and emotional pain
and suffering, EBI argues that the award is clearly excessive,
because in several Louisiana state and federal cases, courts
awarded approximately $350,000 for what are, according to EBI,
comparable mental and emotional damages.  According to EBI, the
disparities between the awards in those cases and the jury's awards
in this case demonstrate that the $1,000,000 award for past and
future physical pain and suffering and the $1,000,000 award for
past and future mental and emotional suffering are clearly
excessive.

EBI arrives at its proposed $1,191,084 total general damages
figure by separately re-calculating proposed "maximum" awards for
physical pain and suffering and emotional pain and suffering on an
injury-by-injury basis.[23] EBI directs the Court's attention to

---

[23] Although the jury heard evidence to the effect that the Plaintiff never
suffered from back pain before the accident, but has suffered from back pain
since, EBI dismisses this evidence noting that there is no objective evidence
that the Plaintiff suffered any back injury in the accident. Consequently, none
of the cases that EBI cites as "points of reference" for the Court include
plaintiffs who suffered back pain.  However, the plaintiff's complaints of back-
pain after the accident, even if related to the disc-removal surgery many years
before, are sufficient to entitle the jury to award damages for that pain,
because "'when a defendant's [negligence] aggravates or accelerates a plaintiff's
pre-existing condition and disables a plaintiff, thus rendering him unable to
continue his work, or said aggravation awakens a dormant condition that causes
a plaintiff to experience pain although he suffered no pain from the condition
prior to the aggravation, such defendant is liable in full for the disability

18

various cases, many of which are unreported or more than ten years old, where Louisiana state and federal courts awarded plaintiffs general damages ranging between $194,000 and $444,000 for what are, according to EBI, comparable physical injuries, and damages of $350,000 for what are, according to EBI, comparable mental and emotional injuries. *E.g.*, <u>Vinet v. Estate of Calix, et al.</u>, 860 So. 2d 160 (La. App. 5 Cir. 2003); <u>Lejeune v. Transocean Offshore Deepwater Drilling Inc</u>., 247 Fed. Appx. 572 (5th Cir. 2007); <u>Thompson v. Amerada Hess Corp</u>., 1998 U.S. Dist. LEXIS 7891 (E.D. La. 1998); <u>Domjan v. Divcon</u>, LLC, et al. 10-3398 (E.D. La. 2012); <u>Nielsen v. Northbank Towing, Inc., et al.</u>, 768 So. 2d 145 (La. App. 1 Cir. 2000); <u>Duncan, et al. v. Kansas City Southern Railway Co.</u>, et al., 773 So. 2d 670 (La. 2000). EBI then applies a 50% multiplier to the highest itemized per-injury awards in the cited cases to arrive at what EBI perceives to be the maximum the jury could have awarded in this case for each of Plaintiff's individual injuries. EBI then proposes a total general damages award that is the sum of its proposed maximum awards for Plaintiff's individual injuries.[24]

   For instance, with respect to the award for past and future physical pain and suffering, EBI argues that the maximum that the

---

and/or pain caused." <u>Todd v. Delta Queen Steamboat Co</u>., 2007-1518 (La. App. 4 Cir. 8/6/08); 15 So. 3d 107, 115-16 (quoting <u>Lopinto v. Crescent Marine Towing, Land Serv. Inc.</u>, 02-2983, 02-3364, 03-0235, 2004 WL 1737901, at *5 (E.D. La. 2004)).

[24] Specifically, EBI asks for a new trial on general damages or a denial of its new trial motion conditioned on the plaintiff's acceptance of an approximately $800,000 reduction of the general damages award from $2,000,000 to $1,191,084. Rec. Doc. 134-1.

jury could have awarded is $666,084. EBI reaches this figure by adding up what it perceives to be the maximum the jury could have awarded for the Plaintiff's hernia and injuries to the Plaintiff's lower extremities collectively. EBI concludes that the maximum that the jury could have awarded for Plaintiff's hernia injury is $66,084 by applying a 50% multiplier to the $44,056 award in <u>Vinet v. Estate of Calix, et al.</u>, 860 So. 2d 160 (La. App. 5 Cir. 2003), a case in which the plaintiff suffered a ventral hernia that required surgery, in addition to unspecified neck and back injuries. EBI then concludes that the maximum that the jury could have awarded for the "injuries to the Plaintiff's lower extremities" is $600,000 by applying a 50% multipier to the $400,000 award in <u>Lejeune v. Transocean Offshore Deepwater Drilling Inc.</u>, 247 Fed. Appx. 572 (5th Cir. 2007), an unreported Fifth Circuit decision in which the Plaintiff sustained a crushed first metatarsal bone and was later diagnosed with Complex Regional pain syndrome. EBI adds these two adjusted figures together for a proposed maximum award of $666,084 for past and future physical pain and suffering.

With respect to the award for past and future mental and emotional suffering, EBI follows a similar pattern to arrive at a proposed maximum award of $525,000. EBI points to two cases, <u>Nielsen v. Northbank Towing, Inc.</u>, et al., 768 So. 2d 145 (La. App. 1 Cir. 2000) and <u>Duncan, et al. v. Kansas City Southern Railway Co., et al.</u>, 773 So. 2d 670 (La. 2000), in which courts awarded

plaintiffs who suffered what constitute, according to EBI, comparable mental and emotional injuries only $350,000. Applying a 50% multiplier to that figure, EBI concludes that the maximum that the jury could have awarded in this case is $525,000. EBI then adds its proposed maximum award for emotional pain and suffering ($525,000) to its proposed maximum award for physical pain and suffering ($664,084) to reach a proposed total general damages award of $1,191,084.

Alternatively, EBI argues that the total general damage award should be remitted to $450,000. Considering the Plaintiff's physical and emotional injuries in the aggregate, EBI asserts that they are "very factually similar" to those that the plaintiff suffered in LaBleu v. Dynamic Industrial Constructors, et al., 526 So. 2d 1184 (La. App. 3 Cir. 1988). Since the award in LaBleu was $300,000, EBI applies a 50% multiplier to get its proposed alternative general damages award of $450,000.

The plaintiff argues that the maximum recovery rule is inapplicable in this case, because the defendant has submitted no factually comparable cases in terms of the plaintiff's injuries and the pain and suffering the plaintiff endured following his accident. Specifically, the plaintiff urges the Court to apply the reasoning followed in two recent maritime cases, Raynes v. McMoran Exploration Co., 10-1730, 2012 WL 1032902 (E.D. La. Mar. 27, 2012) (J. AFRICK) and Thornton v. Diamond Offshore Drilling, Inc., 07-1839, 2008 WL 2622998 (E.D. La. June 30, 2008) (J. VANCE), in which

other sections of the Court declined to apply the maximum recovery rule to remit significant damage awards on the grounds that the facts of the case were simply not comparable to the facts in any other cases within the relevant jurisdiction. The plaintiff argues that all of the cases cited by the Defendants are distinguishable from the instant case. Alternatively, the plaintiff argues that if the maximum recovery rule applies, the jury's award is well within the limits. In support of this argument, the plaintiff asserts that <u>Simeon T. Smith and Son, Inc.</u>, 82 F.2d 1241 (5th Cir. 1988) and <u>Gough v. Natural Gas Pipeline Company</u>, 996 F.2d 763 (5th Cir. 1993) more accurately reflect the type of injuries and suffering the plaintiff in this case endured. The plaintiff asserts that when the awards in <u>Simeon</u> and <u>Gough</u> are adjusted to account for inflation, they demonstrate that the plaintiff's general damage awards do not exceed 150% of the general damage awards in those allegedly factually analogous cases.

Finally, the plaintiff argues that the two million general damage award in this case is not "clearly excessive" in light of the evidence of the physical and emotional pain and suffering that the plaintiff presented at trial. The plaintiff asserts that the jury's award was consistent with the evidence and that the breakdown of the damages[25] demonstrates that the jury logically and

---

[25] The breakdown of the general damages award was as follows:
    $600,000 for past mental and emotional suffering
    $400,000 for future mental and emotional suffering
    $300,000 for past physical pain and suffering
    $700,000 for future physical pain and suffering

reasonably considered the evidence of the physical and emotional suffering the plaintiff experienced in the past and would experience in the future and awarded damages accordingly. Specifically, plaintiff asserts that the breakdown of the general damages award demonstrates the jury's reasonable conclusions that the plaintiff: (1) is likely to suffer several more years of significant chronic pain in the future, and (2) has likely already experienced the worst of his mental and emotional suffering.

In its reply, EBI argues that plaintiff's pain and suffering was exaggerated at trial. Specifically, EBI asserts that plaintiff did not spend multiple days in the hospital following the surgery on his heel as he claimed. EBI also argues that the testimony of Dr. Lawrence Haydel and Chadd Duncan, the plaintiff's orthopedist and physical therapist, showed that plaintiff spent a few months, not a year in a wheelchair. EBI also argues that there was no evidence that plaintiff had developed post-traumatic arthritis in his right heel at the time of trial, and that plaintiff is not crippled in both feet, because the fracture to his left ankle is not as severe as the fracture to his right heel. EBI also asserts that it is inconsistent for plaintiff to claim that he feels a sense of guilt or responsibility for his cousin's husband's death when he sought a judgment as a matter of law on contributory negligence. Finally, EBI asserts that plaintiff engages in speculative math by failing to provide any basis at all for his conversion of the awards in the cases he cites into "today's

dollars."

With respect to EBI's arguments related to the embellishments at trial, the Court notes that the jury heard all of the contradictory evidence about the length of time that the plaintiff spent in the hospital following his surgery and the length of time he spent in a wheelchair in rendering its general damages award. As far as EBI's argument that Dr. Lawrence Haydel's testimony established that plaintiff was not currently suffering from post-traumatic arthritis at the time of trial (Trial Tr. Day 1, 276), Dr. Lawrence Haydel also testified that "whenever you have a fractured calcaneus of this severity, you're going to develop some posttraumatic arthritis." (Trial Tr. Day 1, 280)  He further stated that if the plaintiff developed traumatic arthritis in his joint, it would worsen over time. (Trial Tr. Day 1, 259, 263)  The jury was entitled to award the plaintiff damages for future pain and suffering on that basis of that testimony even though plaintiff was not presently suffering from any post-traumatic arthritis at the time of trial.  Hagerty v. L&L Marine Servs., Inc., 788 F.2d 315, 317, 319 (5th Cir. 1986) (noting in a Jones Act case that "plaintiff is entitled to recover damages for all of his past, present, and *probable* future harm attributable to the defendant's tortious conduct," and that the plaintiff could recover where he could show that the defendants' tortious conduct more probably than not would lead to future condition).  In addition, because human emotion is the antithesis of rational, the Court finds that

plaintiff's freedom from *legal fault* for the accident does not preclude him from suffering from feelings of guilt and responsibility in light of his role in operating the crane prior to the accident.  People who are legally responsible don't necessarily feel guilt and people who feel guilt are not necessarily legally responsible.  Thus, the Court rejects EBI's contentions on those points.


**1. The "Maximum Recovery Rule" and "Clearly Excessive Rule"**

The Fifth Circuit has endorsed two competing methods for evaluating the propriety of a jury award, the "maximum recovery rule," and what may be termed the "clearly excessive rule."  Under the "maximum recovery rule," a court reviewing a jury verdict should remit damage awards that are found to be excessive to the maximum amount the jury could have awarded.  Salinas v. O'Neill, 286 F.3d 827, 830 (5th Cir. 2002).  The maximum amount is determined by comparing the award under scrutiny to awards in other similar cases.  Id.  A multiplier of 150% is then applied to arrive at the maximum recovery amount, and the jury award is remitted to that amount if necessary.  Id.; see also Thomas v. Texas Dep't of Crim. Justice, 297 F.3d 361, 369 n. 8 (5th Cir. 2002).  "'Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if

25

unique facts are present that are not reflected within the controlling caselaw.'" <u>Learmonth v. Sears Roebuck and Co.</u>, 631 F.3d 724, 739 (5th Cir. 2011) (citing <u>LeBron v. United States</u>, 279 F.3d 321, 326 (5th Cir. 2002)). Under the "clearly excessive" rule, a "damage award may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice. <u>Eiland v. Westinghouse Elec. Corp.</u>, 58 F.3d 176, 183 (5th Cir. 1995). Applying this rule, courts have traditionally frowned upon comparing an award to awards in factually similar cases as a method for determining if an award is excessive. <u>Johnson v. Off-shore Express, Inc.</u>, 845 F.2d 1347, 1356 (5th Cir. 1988) ("we do not determine excessiveness of damage awards by comparing verdicts in similar cases, but rather we review each case on its own facts."); <u>see also</u>, <u>Thomas</u>, 297 F.3d at 374 n. 5 (Dennis, J., concurring) (citing Fifth Circuit cases for this proposition). Rather, this inquiry emphasizes the uniqueness of each case, which must be determined upon its own facts, while recognizing that comparisons may serve as a point of reference. <u>Id.</u> at 374. A court's "reassessment of damages cannot be supported entirely by rational analysis, but involves an inherently subjective component." <u>Eiland</u>, 58 F.3d at 183.

**2. The Evidence Supporting the Jury's Awards for Past and Future Physical Pain and Suffering**

The jury awarded the plaintiff one million dollars for his past and future physical pain and suffering. Under the Jones Act, a plaintiff may recover all of his pecuniary losses, including pain and suffering. Cruz v. Hendy Int'l Co., 638 F.2d 719, 723 (5th Cir. 1981). The jury is only permitted to award the plaintiff damages for pain and suffering attributable to an injury caused by the Defendant's negligence. Owens v. Abdon Callais Offshore, LLC, No. 10-3296, 2011 WL 3654239, at *11 (E.D. La. Aug. 19, 2011) (citing Daigle v. L&L Marine Transp. Co., 322 F. Supp. 2d 717, 730 (E.D. La. 2004) (citing Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-15, at 234)). "The standard of causation in Jones Act cases is not demanding." Johnson v. Cenac Towing, Inc., 544 F.3d 296, 302 (5th Cir. 2008). Under the Jones Act, a seaman is entitled to recover damages for injuries that were caused, in whole or in part, by his employer's negligence. Id. (citations omitted); Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997); Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 523 (1957) (applying the same standard of causation used in FELA § 51 cases in a Jones Act case and explaining that "'the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'") (quoting Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506 (1957)). The plaintiff must prove his damages by a

27

preponderance of the evidence.  <u>Clements v. Chotin Trans. Inc.</u>, 496
F. Supp. 163, 168 (M.D. La. 1980).

On the date of the accident, November 17, 2009, Plaintiff was
thrown from a collapsing crane before impacting the ground. (Trial
Tr. Day 1, 106) Plaintiff testified that immediately after the
accident, he had a painful, bleeding cut on his head, experienced
numbness and pain in both feet, and burning pain in his right lower
abdomen. (Trial Tr. Day 1, 106, 109)  Immediately after the
accident, Plaintiff was admitted to the emergency room at Terrebone
General Medical Center ("TGMC") by Dr. Cenac and discharged three
days later on November 20, 2009. (Trial Tr. Day 1, 112, 240)  As
a result of the crane accident, plaintiff sustained a comminuted
fracture of his right calcaneus (heel) and a fracture of his left
talus (ankle). (Trial Tr. Day 1, 241, 265)  CT scans and x-rays
taken by Dr. Lawrence Haydel on November 24, 2009, seven days after
the accident, showed that plaintiff suffered from a severe fracture
of his right heel in which the calcaneus bone was in multiple
pieces and depressed (Trial Tr. Day 1, 242, 245-46)  Dr. Lawrence
Haydel explained to the jury that plaintiff's "entire heel is
crushed, is flattened out and kind of kicked over and pushed out of
place." (Trial Tr. Day 1, 245) Plaintiff's calcaneus fracture in
his right extremity was more severe than the avulsion or "chipping"
fractures on his left side around his ankle. (Rec. Doc. 142-3, p.
32) Upon discharge, plaintiff was sent home in a wheelchair for
about a week to wait for the swelling in his feet to subside so

that surgery on his right heel could be performed. (Trial Tr. Day 1, 112, 240-42) During that week, Plaintiff testified that he was sedated on oxycodone, sleeping in a hospital bed with his feet elevated in large boots, forced to use a bed pan and a urinal to use the restroom, and dependent on his wife's assistance. (Trial Tr. Day 1, 112-13)

On November 25, 2009, eight days after Plaintiff's accident, Dr. Lawrence Haydel performed surgery on Plaintiff's right calcaneus, which involved the placement of a metal plate and screws to realign the joint surface, decrease the risk of posttraumatic arthritis, and improve plaintiff's joint motion. (Trial Tr. Day 1, 245-46) Plaintiff testified that he was hospitalized for approximately five or six days with both of his feet in hard casts and received pain medications through an IV. (Trial Tr. Day1, 114) Plaintiff recounted that he experienced significant pain on the second and third day after his surgery, because the IV with his pain medication had gone through the vein in his arm creating a six inch bulge filled with fluid and medication in his elbow. (Trial Tr. Day 1, 114) However, Dr. Lawrence Haydel testified that he performed the surgery on Plaintiff's right heel on November 25, 2009 and discharged Plaintiff the next day in a splint, rather than a cast, because of the swelling from the surgery. (Trial Tr. Day 1, 247) Moreover, the TGMC records that were admitted into evidence show that plaintiff was admitted to TGMC on November 25, 2009, and discharged at 9:45 a.m. on November 26, 2012, the day

after Dr. Lawrence Haydel performed the surgery on his right heel. (Trial Exhibit 14, Bates numbers Naquin 001428 – Naquin 001432) Plaintiff testified that immediately after his surgery, he was unable to walk, and slept in a hospital bed in the den of his house while his wife slept in their regular bedroom. (Trial Tr. Day 1, 115-16) He further testified that while he was initially taking oxycodone to manage his pain, he stopped taking oxycodone after his wife expressed concern that he might develop an addiction to the painkiller. (Trial Tr. Day 1, 117-18)

Following his surgery, plaintiff attended nine post-surgery follow-up visits with his orthopedist, Dr. Lawrence Haydel, between December 1, 2009 and April 3, 2012. (Trial Tr. Day 1, 248-58) Plaintiff also attended three post-surgery visits with Dr. Sweeny, the defense medical expert, between April 20, 2010 and August 10, 2010. (Rec. doc. 142-3, p. 38) During his first post-surgery follow-up visit with Dr. Lawrence Haydel on December 1, 2009, Plaintiff's legs were placed in short-leg fiberglass casts. (Trial Tr. Day 1, 248) During his second post-surgery follow-up visit, approximately one-month after his surgery, Dr. Lawrence Haydel placed Plaintiff in bilateral, removable walking boots, so that Plaintiff could begin physical therapy, provided Plaintiff with a prescription for a walker with wheels, and permitted Plaintiff to begin weight bearing on his left but not his right foot. (Trial Tr. Day 1, 248-49) Plaintiff underwent over seventy painful physical therapy sessions with Chadd Duncan, a licensed physical

therapist, between December 22, 2009 and August 19, 2010. (Trial Tr. Day 1, 118, 284) During his third post-surgery follow-up visit with Dr. Lawrence Haydel, approximately three months after his surgery, his orthopedist permitted plaintiff to increase his weight bearing on the right heel and testified that Plaintiff was improving with physical therapy. (Trial Tr. Day 1, 253-54) Plaintiff testified that he spent close to a year in a wheelchair after his surgery. (Trial Tr. Day 1, 117) Dr. Lawrence Haydel, plaintiff's orthopedist, testified that Plaintiff would have needed a wheelchair for "a three-months duration at least," and that while Plaintiff would be able to walk after three months, he would probably require a wheelchair to do shopping or other activities that required him to walk long distances. (Trial Tr. Day 1, 267, 269) Dr. Lawrence Haydel also stated that it would be up to Plaintiff whether he used a wheelchair at home regardless of his progress at physical therapy. (Trial Tr. Day 1, 268)

Throughout all of his visits to both Dr. Sweeney and Dr. Lawrence Haydel over the course of approximately two and a half years after his surgery, plaintiff reported pain in both lower extremities. Dr. Lawrence Haydel testified at trial and Dr. Sweeny's trial deposition was read to the jury. Both doctors observed that following the surgery, Plaintiff's fractures were healing well,[26] but that Plaintiff continued to report that he

---

[26] By January 18, 2010, approximately two months after the plaintiff's accident and right heel surgery, Dr. Lawrence testified that x-rays showed that all of the plaintiff's fractures were healing well. (Trial Tr. Day 1, 253-54) Similarly,

31

experienced significant pain.  Dr. Lawrence Haydel testified that Plaintiff's fractures were healing well by April of 2010.  (Trial Tr. Day 1, 248, 254)  However, Plaintiff reported pain over his left ankle in the region of his talus fracture and continued to suffer from recurrent swelling in both feet, for which Dr. Haydel prescribed Plaintiff Celebrex, a prescription anti-inflammatory and pain medication.  (Trial Tr. Day 1, 254, 270)  Similarly, Dr. Sweeney testified that in April of 2010, Plaintiff walked with a painful limp, had swelling and tenderness his left and right feet, with greater swelling as well as discoloration in his right foot. (Rec. Doc. 142-3, p. 17, 22, 24)  By June of 2010, seven months after his heel surgery, Plaintiff continued to suffer from pain in both heels and ankles and developed plantar fasciitis, an inflammatory condition in the sole of the foot.  (Trial Tr. Day 1, 255)  Dr. Haydel administered an injection to the plantar fascia and prescribed Plaintiff Celebrex, a prescription anti-inflammatory and pain medication  (Trial Tr. Day 1, 255-56, 270)  On June 8, 2010, during his visit with Dr. Sweeney, Plaintiff reported moderate to severe pain most of the time as well as pain in his shoulders from using forearm crutches.  (Rec. Doc. 142-3, p. 39) Dr. Sweeney also observed that at this point, and in spite of his physical therapy, Plaintiff had limited ability to walk or stand. (Rec. Doc. 142-3, p. 43)  During his August 2010 visit with Dr.

---

on June 7, 2010, six months after the plaintiff's surgery, Dr. Lawrence Haydel testified that x-rays indicated that plaintiff's fractures were healing well. (Trial Tr. Day 1, 255)

Lawrence Haydel, Plaintiff also reported pain in the lateral aspect of his left foot where he sustained the talus fracture, pain in the plantar aspect of his right heel, and only temporary relief from the steroid injection administered during his previous visit with Dr. Lawrence Haydel in June of 2010.  (Trial Tr. Day 1, 256, 246)

By October of 2010, approximately eleven months after Plaintiff's accident and right heel surgery, Plaintiff's right talus fracture had completely healed, and Dr. Lawrence Haydel diagnosed him with tendonitis developing over the site of the left talus fracture and injected the area with steroids to manage the pain.  (Trial Tr. Day 1, 257)  Plaintiff also continued to report plaintiff continued to report pain in his right joint region and heel.  (Trial Tr. Day 1, 257)   In addition, Dr. Lawrence Haydel noted that on that date, the left talus fracture was fully healed, but that he diagnosed plaintiff with tendonitis developing over the site of the left talus fracture and injected that area with steroids.  (Trial Tr. Day 1, 257)  On April 3, 2012, approximately two years and a half years after his surgery, plaintiff returned to Dr. Lawrence Haydel  (Trial Tr. Day 1, 258)  Plaintiff's fractures were fully healed and had good position of the joint.  (Trial Tr. Day 1, 258)  Nevertheless, plaintiff reported recurrent discomfort in his left foot and in the heel of his right foot, and Dr. Lawrence Haydel noted tenderness on his right heel and left ankle.  (Trial Tr. Day 1, 258)  Dr. Lawrence Haydel opined that Plaintiff was suffering from chronic pain as a result of the trauma to his

33

calcaneus, chronic pain in his left foot in the area of his talus fracture due to tendonitis, and plantar fasciitis.[27] (Trial Tr. Day 1, 258-59, 263).  Although Dr. Lawrence Haydel testified that on April 3, 2012, Plaintiff had not yet developed any post-traumatic arthritis, he also testified that Plaintiff had a "high risk" of developing post-traumatic arthritis due to the severity of his calcaneus fracture and that "whenever you have a fractured calcaneus of this severity, you're going to develop some posttraumatic arthritis."  (Trial Tr. Day 1, 280)  He further stated that if Plaintiff developed traumatic arthritis in his joint, which was a "high risk," it would worsen over time, and in that event, a fusion of the joint would be a treatment option. (Trial Tr. Day 1, 259, 263)  Dr. Lawrence Haydel testified that the only treatment that could be provided to manage Plaintiff's pain as of the time of trial was anti-inflammatories, heat, and stretching exercises. (Trial Tr. Day 1, 263)   On cross-examination, Dr. Lawrence Haydel testified that although there was no evidence of post-traumatic arthritis and that he had not diagnosed Plaintiff with post-traumatic arthritis, "[Plaintiff] probably has some arthritic changes there because the joint was involved.  It has to come to a certain degree before it starts showing up on x-ray." (Trial Tr. Day 1, 276)  Plaintiff testified that he continued to

---

[27] Dr. Lawrence Haydel explained that plantar fasciitis is a condition in which the fascial layer on the sole of the foot becomes inflamed and causes pain.

experience pain in his feet at the time of trial.  (Trial Tr. Day 1, 119)

Dr. Sweeney testified that the fact that both of Plaintiff's lower extremities had sustained fractures made Plaintiff's recovery more difficult.  (Rec. Doc. 142-3, p. 32)  Dr. Sweeney also rendered his opinion that Plaintiff "would, in all likelihood, not recover completely and he would be left with a whole person impairment . . ."  (Rec. Doc. 142-3, p. 33)

Plaintiff testified that following the accident, he experienced back and knee pain that he had not experienced prior to his accident.  (Trial Tr. Day 1, 215, 229)  Although Plaintiff underwent surgery to have a disc removed in 1975, he testified that he had not experienced any back pain during the ten years preceding the accident and began to experience back pain after the accident for which he occasionally took Aleve.  (Trial Tr. Day 1, 119, 120)  None of Plaintiff's doctors treated him for a back injury following the accident despite his complaints of pain.[28]  (Trial Tr. Day 1, 215-16)  Plaintiff further testified that he had cartilage removed from his knee in the mid-1980s and that changes in his walking gait as a result of his foot injuries caused him to have problems with

---

[28]  Dr. Lawrence Haydel testified that plaintiff never complained of back pain and that he never treated plaintiff for back pain.  (Trial Tr. Day 1, 278)  The plaintiff reported back pain to his family practitioner, Dr. Guidry, on August 12, 2010.  (Trial Tr. Day 2, 453; Tr. Ex. 16, p. 9)  The plaintiff reported lower back pain to Trevor Bardarson during his functional capacity evaluation on September 22, 2010, approximately ten months after his accident.  (Trial Tr. Day 2, 422, 431)  The plaintiff also reported back pain to his vocational rehabilitation specialist, Dr. Cornelius Gorman, when he met with him on June 6, 2011.  (Trial Tr. Day 1, 318)

his knees.  (Trial Tr. Day 1, 120)  Plaintiff reported knee pain during his evaluation with Dr. Gorman on June 6, 2011.  (Trial Tr. Day 2, 336)

On February 25, 2010, approximately three months after the crane accident, plaintiff sought treatment from Dr. Gerald Haydel who diagnosed him with a large right inguinal hernia.[29] (Trial Tr. Day 1, 234-35)  On March 4, 2012, Dr. Haydel performed a hernioplasty on Plaintiff under general anesthesia.  (Trial Tr. Day 1, 234-35)  During the course of the surgery, Dr. Gerald Haydel discovered that plaintiff actually suffered from a double hernia, including a large direct hernia as well as an indirect hernia, and inserted mesh into Plaintiff's groin area.  (Trial Tr. Day 1 234-35)  Dr. Gerald Haydel's record's reflect that he saw Plaintiff three times after performing the hernioplasty, and that by April, 20, 2012, approximately two months after the surgery, Plaintiff's hernia repair was completely healed and asymptomatic with no tenderness and no pain. (Trial Tr. Day 1, 236, 238)[30]

---

[29]  Dr. Gerald Haydel characterized the injury as a "weakness in the groin area around the fascia." (Trial Tr. Day 1, 234-35)

[30]  Although Dr. Gerald Haydel's testimony regarding whether or not the crane accident caused the plaintiff's hernia injury was ambivalent, a reasonable jury could have concluded that the plaintiff's hernia injury was more probably than not caused by the crane accident.  Dr. Gerald Haydel acknowledged that the injury was consistent with the type of trauma the plaintiff reported.  (Trial Tr. Day 1, 237) He further opined that the plaintiff would have experienced significant pain picking up or moving things if he had the hernia prior to the accident. (Trial Tr. Day 1, 237)  The jury heard evidence that the plaintiff's day to day work while employed at EBI involved cleaning, painting, and chipping boats, changing boards on the decks of boats, fixing broken glass on windshields, and changing floors. (Trial Tr. Day 1, 141)  The plaintiff also recounted that "sometimes I had to pull the exhaust pipes off, maybe replace and engine.  Get on the crane and – on the boat and pull that engine out and put another one in." (Trial Tr. Day 1, 141)  The jury did not hear any evidence that plaintiff had complained of pain in the course of performing such manual labor and lifting

Plaintiff testified that as of the time of trial, he was taking two Lyrica twice a day, Lexapro for depression, and Aleve for his back pain occasionally. (Trial Tr. Day 1, 120-21) Plaintiff testified that he always uses a cane to walk. (Trial Tr. Day 1, 129) Plaintiff testified that he continues to experience pain in his right foot that gets worse in the evening, rating 8 on a scale of 1-10. (Trial Tr. Day 1, 131) On cross-examination, Plaintiff concedes that he regularly suffers from pain that rates as a 6 on the scale from 1-10. (Trial Tr. Day 1, 217) He also testified that he suffers from shaking, stiffness, and inability to control the toes on his right foot. (Trial Tr. Day 1, 131) He testified that he experiences somewhat less pain in his left foot, somewhere around 5-6 on a scale of 1-10. (Trial Tr. Day 1, 131) He further testified that he took Lyrica for his pain as prescribed by his family doctor and only took narcotic pain medication for a brief period immediately after the accident, because his wife was concerned about him developing an addition. (Trial Tr. Day 1, 131) Plaintiff testified that the Lyrica "does real well to help me out." (Trial Tr. Day 1, 213) Dr. Larry Haydel testified that

_____

activities prior to his accident. The jury did not hear any testimony about any other event that could have caused the plaintiff hernia injury. Under the circumstances, a reasonable jury could have concluded that the crane accident played a part in producing the hernia injury and awarded the plaintiff damages for physical pain and suffering associated with the hernia injury and the surgery the plaintiff underwent to repair it. See Owens v. Abdon Callais Offshore, LLC, 10-3296, 2011 WL 3654239, at *7 (E.D. La. Aug. 19, 2011) (finding sufficient evidence that accident had caused back injury where physician testified that the plaintiff's back injury was likely caused by a traumatic event, and plaintiff had worked for two years before his accident as an unlicensed engineer without any difficulty). In addition, in its opposition, EBI apparently concedes that the plaintiff's hernia was caused by the accident.

Lyrica probably will not help with pain unless it is neurogenic in nature. (Trial Tr. Day 1, 276) Dr. Lawrence Haydel also testified that he never received complaints of pain that were 8 or 6 on a scale out of 10, but he also testified that he never quantified Plaintiff's pain on a scale of 1-10. (Trial Tr. Day 1, 275-76, 278-79) Dr. Lawrence Haydel also testified that he would not prescribe narcotic-type pain medication for chronic pain, because "it kind of created another problem for the patient to become addicted to, and then over time they build a tolerance to it." (Trial Tr. Day 1, 280) Plaintiff complained of having "a lot of pain in my feet and my back and my knee." (Trial Tr. Day 1, 214) Plaintiff also testified that he periodically takes Celebrex for swelling. (Trial Tr. Day 1, 215) Although, plaintiff did not seek pain treatment very frequently in 2011, he testified that Dr. Sweeney told him in 2012 that there was nothing more that they could offer him to get better. (Trial Tr. Day 1, 228) Plaintiff testified that he always uses a cane, and that his goal is to be able to get around without relying so much on the cane. (Trial Tr. Day 1, 129)

### 3. The Evidence Supporting the Jury's Awards for Past and Future Mental and Emotional Pain and Suffering

The jury awarded Plaintiff one million dollars for his past and future mental and emotional pain and suffering. Although Plaintiff was unaware of the condition of his co-worker and family members while in the emergency room immediately following his

accident, he worried about his family, friends, and co-workers who were working in the building where the crane collapsed. (Trial Tr. Day 1, 110)  The day after the accident, Plaintiff learned that his cousin's husband had been killed when the crane fell through the roof of the building.  (Trial Tr. Day 1, 111)  Plaintiff and his wife testified that he was devastated by the news of his cousin's husband's death.  (Trial Tr. Day 1, 111; Trial Tr. Day 2, 397)  In the weeks following the accident, Plaintiff experienced nightmares about the accident that interfered with his sleep.  (Trial Tr. Day 1, 114; Trial Tr. Day 2, 398) and at the time of trial, he continued to have nightmares about the accident two to four times per week, in which he would wake up in the middle of the night screaming.  (Trial Tr. Day 1, 114; Trial Tr. Day 2, 398)

Plaintiff testified that he sought treatment for depression from Dana Davis, a licensed social worker. (Trial Tr. Day 2, 343) once per week immediately following the accident, and that at the time of trial, he attended counseling once per month.  (Trial Tr. Day 1, 172)  Dr. Gorman, plaintiff's vocational rehabilitation specialist, testified that Plaintiff had attended counseling sessions with Dana Davis at least twenty-nine times since his accident.  (Trial Tr. Day 2, 343)  Dr. Sweeney testified that on August 10, 2012, approximately seven months after his accident, Plaintiff reported to him that he was suffering from depression and that his wife had removed all the guns to which Plaintiff had access.  (Rec. Doc. 142-3, p. 34, 37-39)  About nine months after

the accident, Plaintiff sought treatment at the Family Doctor Clinic and reported that he was suffering from depression, bad dreams, and suicidal thoughts. (Trial Tr. Day 1, 125) Plaintiff reported that his wife would periodically find him crying in their yard and Plaintiff's wife recounted an episode in which she found her husband sitting on the bench by his brother's grave crying. (Trial Tr. Day 1, 125; Trial Tr. Day 2, 402) Plaintiff reported that his wife was so worried that he might attempt to kill himself that she called his son over and took all of his guns, and Plaintiff's wife confirmed that she was worried about her husband harming himself. (Trial Tr. Day 1, 125; Trial Tr. Day 2, 402) Plaintiff testified that he turned suicidal, because he felt guilty about the death of his co-worker and the impact on his co-worker's family, and perceived that his family was avoiding him even though there was nothing he could have done. (Trial Tr. Day 1, 126) Plaintiff's wife testified that her husband felt guilty that he lived and his cousin's husband died. (Trial Tr. Day 2, 403) Plaintiff testified that at the time of trial, he was taking Lexapro prescribed by his family doctor, Dr. Guidry, once a day for his depression and that the medication causes his to gain weight, gives him headaches, and affects his memory, making it difficult for him to remember names. (Trial Tr. Day 1, 122, 214)

Plaintiff testified that his family relationships and social life changed following the accident. (Trial Tr. Day 1, 126) While in a wheelchair after his surgery, Plaintiff struggled with not

40

being able to participate in family activities like the other
members of his family and with feeling like a burden on his family
members.[31] (Trial Tr. Day 1, 117)  Plaintiff testified that as a
result of the accident, he is unable to attend many social
functions with his family and friends, because of his lack of
mobility, or because there is no room for his wheelchair, or
because it is too dangerous for him to attend.  (Trial Tr. Day 1,
136)  Plaintiff testified that the accident adversely affected his
relationship with his wife, and his wife testified that the
accident affected their intimacy.  (Trial Tr. Day 1, 135; Trial Tr.
Day 2, 204)  As a result of his accident, Plaintiff was forced to
sell many personal effects that he was no longer able to use and
enjoy as a result of his injuries, including his truck and
motorcycle.   Prior to his accident, plaintiff and his family
enjoyed riding motorcycles and attending car shows, but as a result
of his accident, plaintiff testified that he is unable to ride
motorcycles or attend car shows.  (Trial Tr. Day 1, 132-34; Trial
Tr. Day 2, 403)  He gave his truck to his daughter, because he was
unable to get into it.  (Trial Tr. Day. 1, 134)  Plaintiff was also
forced to sell the property where he was born and raised, which was
formerly owned by his father, because he was unable to maintain the
property as he had done before his accident and did not want to

---

[31] The plaintiff, a man who had formerly been active in riding motorcycles and
loved working, specifically testified that he struggled with "not being able to
go around with my family and do things with my family like everybody else.
Lagging behind and bothering people to do this for me and push me there. (Trial
Tr. Day 1, 117)

burden his busy children with maintaining the property. (Trial Tr. Day 1, 134-135)  Plaintiff's wife testified that his father's property meant more to Plaintiff than his own property. (Trial Tr. Day 2, 401)

Plaintiff testified that he missed working and used to love being with his friends at his job. (Trial Tr. Day 1, 127)  He also testified that he had intended to work until he was seventy years old and that his father worked until he died at the age of 67. (Trial Tr. Day 1, 131)  Although Plaintiff stated that he may be able to perform some type of sedentary work in the future provided his depression improves, (Trial Tr. Day 1, 214) this is likely an overly optimistic assessment.  Dr. Gordon, the vocational rehabilitation specialist who evaluated Plaintiff approximately a year and a half after the accident, (Trial Tr. Day 2, 236) stated in his report that Plaintiff was totally and permanently disabled and that there were no future jobs available for Plaintiff. (Trial Tr. Day 2, 320, 324)

Numerous witnesses, even adverse witnesses, bolstered Plaintiff's account of his mental and emotional suffering.  Dr. Gordon, plaintiff's vocational rehabilitation specialist, testified that during their meeting, over a year and a half after the accident, plaintiff had "a lot of emotional reaction talking with me and describing some things." (Trial Tr. Day 2, 332)  Trevor Bardarson, a defense witness who preformed a functional capacity evaluation ten months after plaintiff's accident and whose

42

testimony was offered by the defense to suggest that Plaintiff was exaggerating his physical symptoms, (Trial Tr. Day 2, 445) corroborated Plaintiff's account of his emotional suffering. For instance, Mr. Bardarson testified on direct examination that "[Plaintiff] was very high on issues that related to depression and psychological distress," that "[Plaintiff] was having a lot of difficulty, psychologically, I think, with the injury and dealing with everything that happened," and that there is "a very strong psychological issue going on here that's impacted [Plaintiff] from a physical standpoint." (Trial Tr. Day 2, 439) On cross-examination, Mr. Bardarson stated that he did not doubt the validity or truthfulness of Plaintiff's complaints of depression, bad dreams, and suicidal thoughts, and recollected from his interaction with Plaintiff that he was "very distraught." (Trial Tr. Day 2, 456)

To summarize, following the accident, Plaintiff sustained cuts to his head, a hernia that required surgery, a fracture to his left talus and other avulsion or "chipping" fractures in his left foot, a very severe fracture to his right calcaneus (heel) that required surgery and the insertion of a plate and pins, back pain and knee pain as a result of changes in his walking stride, tendonitis over the site of the fracture in his left foot, and plantar fasciitis. Immediately following the accident, Plaintiff's lower extremities were so swollen that he spent a week at home on narcotic strength pain medications waiting for the swelling to diminish so that his

surgery could be performed on his right heel without complications. As a result of the accident, plaintiff underwent two surgeries. The surgery on his right heel, performed approximately one week after the accident, involved the insertion of a plate and multiple screws into Plaintiff's right heel.  The surgery on Plaintiff's double hernia involved the insertion of mesh into to Plaintiffs groin area.  Following his surgeries, Plaintiff underwent over seventy painful physical therapy sessions over the course of approximately eight months to try to improve his ability to walk while his feet were swollen and in pain.  Although the fractures in Plaintiff's left and right extremities are healed, Dr. Haydel opined that Plaintiff will continue to experience chronic pain in his left and right feet, and that there is a very high risk that Plaintiff will develop post-traumatic arthritis in the joint where his calcaneus surgery was performed which will worsen with time. Plaintiff, a man who loved to work, is permanently disabled and unemployed according to the medical and vocational rehabilitation experts, despite his cautious optimism that he may be able to perform some type of sedentary work in the future.  Plaintiff is currently dependent upon a cane.

Moreover, by all accounts, Plaintiff experiences severe mental and emotional pain and suffering as a result of his accident.  He endured the death of his cousin's husband in the crane accident, several months of physical therapy in which he achieved only minimal improvement and had to come to terms with that fact that

his injuries were likely permanent, his inability to engage in social and family activities he enjoyed prior to the accident, his inability to return to work at a job that he loved, his feeling of being a burden on his family, and adverse changes in his relationship with his wife. Following the accident, Plaintiff was depressed and suicidal at times. At the time of trial, Plaintiff continued to suffer from depression for which he takes Lexapro, a medication that gives him various negative side effects, and seeks counseling from a social worker approximately once per month. Plaintiff also continues to suffer from recurrent nightmares about the accident that are so vivid he wakes up screaming.

**4. Application of the Maximum Recovery Rule and Clearly Excessive Rule to the Evidence**

As discussed above, application of the maximum recovery rule presupposes the existence of a case that is factually analogous in terms of the nature, intensity, and duration of Plaintiff's aggregate injuries, as well as the categories of damages awarded. The Court can find no precedent for EBI's proposed piecemeal method for determining the maximum that the jury could have awarded in this case for Plaintiff's physical and emotional pain and suffering. Moreover, EBI relied on several unreported awards in reaching its proposed piecemeal figure, and the Court will not consider unreported awards for quantum purposes, as they generally lack precedential value. <u>LeBron v. United States</u>, 279 F.3d 321, 326

(5th Cir. 2002).  Moreover, EBI has offered no comparable factual analog to the instant case in terms of the aggregate injuries that Plaintiff suffered.  The fact that EBI re-calculated the "maximum" award the jury could have awarded based on the evidence by looking at Plaintiff's injuries in a piecemeal fashion and applying a 50% multiplier to the itemized awards in several cases where plaintiffs suffered some, but far from all, of the physical or emotional injuries that Plaintiff suffered in this case suggests that EBI was unable to locate a case that is truly factually analogous to the case at hand in terms of the nature, duration, and intensity of Plaintiff's injuries. Thus, the Court rejects the methodology by which EBI drew from various cases where plaintiff's suffered only one or a few, but not all, of the injuries that Plaintiff in this case suffered in the aggregate to reach its proposed award of $1,191,084.  The only reported case that EBI argues is factually analogous when Plaintiff's physical and emotional pain and suffering are viewed in the aggregate, <u>LaBleu</u>, is not factually analogous in terms of the nature and extent of Plaintiffs physical and emotional injuries.

Moreover, the Court is reluctant to rely on <u>LaBleu</u> for quantum purposes, because it was decided in 1988.  Although the award in <u>LaBleu</u> is over twenty-years old, EBI asserts that <u>LaBleu</u> remains relevant and on-point, because the Fifth Circuit relied heavily on the case in <u>Lejeune v. Transocean Offshore Deepwater Drilling, Inc.</u>, 247 Fed. Appx. 572 (5th Cir. 2007).

Although EBI is correct that the Fifth Circuit relied heavily on
<u>LaBleu</u> in <u>LeJeune</u>, <u>Lejeune</u> is an unpublished opinion issued after
January 1, 1996 that consequently lacks precedential value.[32]  Thus,
this Court is not necessarily bound to follow the Fifth Circuit's
unusual approach in that unreported decision and examine a damage
award that is over twenty years old.  In reported Fifth Circuit
precedent, the Fifth Circuit has routinely considered only
reported[33] awards from the relevant jurisdiction within the last ten
years for quantum purposes.  <u>See e.g.</u>, <u>Simeon v. T. Smith & Son,
Inc.</u>, 852 F.2d 1421, 1427 n. 7 (5th Cir. 1988) (sampling reported
general damage awards in cases involving somewhat comparable
injuries within the prior *ten* years in a Jones Act case); <u>Lebron
v. United States</u>, 279 F.3d 321, 328 (5th Cir. 2002) (sampling two
reported awards in cases involving roughly comparable injuries
within the prior *ten* years); <u>Douglass v. Delta Air Lines, Inc.</u>,

---

[32] Unpublished opinions issued on or after January 1, 1996 are not precedent,
except under the doctrine of res judicata, collateral estoppel, or law of the
case (or similarly to show double jeopardy, notice, sanctionable conduct,
entitlement to attorney's fees, or the like). Fed. R. App. P. 47.5.4.

[33] In <u>Foradori v. Harris</u>, 523 F.3d 477 (5th Cir. 2008), the Fifth Circuit declined
to apply the maximum recovery rule where there were "'no reported cases from [the
relevant jurisdiction] addressing the recovery for pain and suffering for
injuries like those sustained by the plaintiff,'" and the defendants' attorney
offered a selective sampling of only two cases from outside of the relevant
jurisdiction, one of which was an award from 1984.  <u>Id.</u> at 505-06.  The Court
declined to rely on the 1984 decision and declined to find the plaintiff's award
excessive.  <u>Id.</u> at 505.  In a footnote, the court criticized the defendant's
narrow sampling of reported decisions from foreign jurisdictions, and observed
that the defendant gave no reason for omitting many other foreign cases involving
somewhat similar injuries, including one unreported 2006 decision from
Connecticut.  <u>Id.</u> at 505 n. 22.  Thus, the footnote in <u>Foradori</u> suggests that
when there are no recent reported cases from the relevant jurisdiction,
unreported awards from outside of the relevant jurisdiction might have some
persuasive value, provided they are *recent*.  The unreported award to which the
Fifth Circuit referred was only two years old when <u>Foradori</u> was decided.

897 F.2d 1336, 1344-45 (5th Cir. 1990) (sampling reported awards in cases involving roughly comparable injuries within the prior *four* years); Wheat v. United States, 860 F.2d 1256, 1260-63 (5th Cir. 1988) (sampling reported general damage awards in cases involving roughly comparable injuries within the prior *seven* years); In re Air Crash Disaster, 767 F.2d 1151, 1156-57 (5th Cir. 1985) (sampling reported general damage awards for loss of love and affection of a spouse and loss of love and affection of a child within the prior *five* years); Wakefield v. United States, 765 F.2d 55, 60-61 (5th Cir. 1985) (sampling reported general damage awards in cases involving roughly comparable injuries within the prior *nine* years); Gutierrez v. Exxon Corp., 764 F.2d 399, 403 (5th Cir. 1985) (comparing general damage award to award for similar injuries in a case that was only two years old).  The Court was able to locate one recent exception to this general practice of sampling only recent awards, Learmonth v. Sears, Roebuck and Co., 631 F.3d 724 (5th Cir. 2011), in which the Fifth Circuit considered two recent unreported decisions and one reported decision that was over twenty years old, Wells Fargo Armored Service Corp. v. Turner, 543 So. 2d 154 (Miss. 1989), for purposes of quantum comparison.  Id. at 738.  However, this case is clearly an exception to the well-established general practice of looking only at recent awards for purposes of quantum comparison, and the Fifth Circuit ultimately distinguished Learmonth from Turner, instead of using it to remit the plaintiff's award.  In this case, like in Learmonth, neither

48

Lejeune nor LaBleu are factually analogous in terms of the nature, severity, and duration of the respective plaintiffs' injuries.

After examining the cases cited by the parties and researching the issue independently, the Court finds that the maximum recovery rule is not implicated, because "this case presents unique facts for which there are no controlling cases in the relevant jurisdiction." Learmonth, 631 F.3d at 739 (citing Vogler v. Blackmore, 352 F.3d 150, 158 (5th Cir. 2003)). In addition, the Court finds that the general damage award is not clearly excessive. District courts may only overturn damage awards upon "a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice." Eiland, 59 F.3d at 183. An "excessive" award is one that is "so large as to shock the judicial conscience," or "so gross or inordinately large as to be contrary to right reason," or clearly in excess of "that amount that any reasonable man could feel the claimant is entitled to." Foradori, 523 F.3d at 504 (internal quotation marks and citations omitted). The Court observed all of the witnesses at trial and has exhaustively reviewed the evidence supporting the general damage award in this case, as well as the evidence supporting the general damage awards in the cited cases. Although the general damages award in this case is certainly generous, it does not shock this Court's judicial conscience or exceed that amount that *any* reasonable man could feel Plaintiff is entitled to in light of his aggregate physical and emotional injuries. Thus, the Court

49

declines to substitute its judgment for that of the jury by ordering a new trial or remittitur of Plaintiff's general damages award.

**D.    EBI's Motion for a New Trial, or Alternatively, for Remittitur on Issue of Past Lost Wages**

In its fourth motion, EBI moves for a new trial, or alternatively, for remittitur of the jury's award for past lost wages.[34] The jury awarded Plaintiff $160,000 for past lost wages even though Dr. Rice, Plaintiff's expert economist, calculated Plaintiff's past wage loss to be $153,442, and John Theriot, EBI's expert economist, calculated Plaintiff's past wage loss to be $125,429.[35] EBI argues that the award is excessive to the extent that it exceeds the highest figure offered by either party's expert. Relying on the Fifth Circuit's decision in Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 168-69 (5th Cir. 1990), EBI argues that the court should order a new trial on past lost wages or condition the denial of a new trial on Plaintiff's acceptance of a remittitur in the amount of $6,558, the amount by which the award exceeded the highest figure offered by either expert.

In Treadaway, the Fifth Circuit, applying the maximum recovery rule, reduced a past lost wages award in excess of the

---

[34] Rec. Doc. 135.

[35] Trial Transcript, p. 346; Trial Exhibit 24a; Trial Transcript, p. 520; Trial Exhibit 26.

highest figure offered by either party's expert to the higher figure supplied by the plaintiff's economist. Id. at 169-70. The Court reasoned that the jury exceeded the maximum it could have awarded based on the evidence, since there was no evidentiary support in the record for an amount in excess of the figure supplied by the plaintiff's own expert economist. Id. at 169. Similarly, in the instant case, there is no evidentiary support in the record for an award in excess of the figure offered by Dr. Rice.

Plaintiff's counsel has apprised the Court that he does not oppose the remittitur of the award for past lost wages. (Rec. Doc. 159) Because the motion is well-founded and unopposed, the Court finds that EBI's motion for a new trial on the issue of past lost wages should be denied conditioned on Plaintiff's acceptance of a remitted past lost wages award of $153,442.00.

Accordingly, for the reasons expressed above, **IT IS HEREBY ORDERED** that EBI's motions for judgment as a matter of law, or alternatively, for a new trial on the issues of seaman status **(Rec. Doc. 126)** and future lost wages **(Rec. Doc. 133)** are **DENIED**. **IT IS FURTHER ORDERED** that EBI's motion for a new trial, or alternatively, remittitur of the general damages award **(Rec. Doc. 134)** is hereby **DENIED**, and EBI's motion for a new trial on past lost wages **(Rec. Doc. 135)** is **DENIED**, conditioned on Plaintiff's

acceptance of a remitted past lost wages award in the amount of $153,442.00.

New Orleans, Louisiana this 15th day of November, 2012.


_____
CARL J. BARBIER
UNITED STATES DISTRICT COURT