

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   **JUN 2 6 2014**

WILLIAM W. BLEVINS
CLERK

No. 12-31258

D.C. Docket No. 2:10-CV-4320

United States Court of Appeals
Fifth Circuit

**FILED**

March 10, 2014

Lyle W. Cayce
Clerk

LARRY NAQUIN, SR.,

        Plaintiff – Appellee

v.

ELEVATING BOATS, L.L.C.,

        Defendant - Appellant

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before DAVIS and JONES, Circuit Judges, and MILAZZO, District Judge.[*]

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed in part and vacated in part, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

_____ Fee_____
_____ Process_____
__X__ Dktd_____
_____ CtRmDep_____
_____ Doc. No._____

JONES, Circuit Judge, dissenting.

ISSUED AS MANDATE: 2 0 JUN 2014

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
Deputy

New Orleans, Louisiana    2 0 JUN 2014

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 12-31258

_____

LARRY NAQUIN, SR.,

Plaintiff-Appellee

v.

ELEVATING BOATS, L.L.C.,

Defendant-Appellant

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 10, 2014

Lyle W. Cayce
Clerk

Before DAVIS and JONES, Circuit Judges, and MILAZZO, District Judge.[*]

W. EUGENE DAVIS, Circuit Judge:

Defendant-Appellant Elevating Boats, LLC ("EBI") employed Plaintiff-Appellee Larry Naquin, Sr. ("Naquin") as a vessel repair supervisor at its shipyard facility in Houma, Louisiana. After Naquin was severely injured in an accident in the shipyard, a jury found that EBI was negligent, found that Naquin qualified for seaman status, and awarded him money damages under the Jones Act. Because the evidence supports the jury's determination of seaman status and liability, we AFFIRM the district court's judgment on liability; because the damages determination was erroneously based upon emotional

_____

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

No. 12-31258

anguish resulting from the death of a third party, we VACATE the damages award and REMAND for a new trial on damages.

I.

EBI manufactures, operates, and maintains a fleet of specialty lift-boats[1] and marine cranes out of several Louisiana port facilities. EBI employed Naquin at its shipyard in Houma, Louisiana, where he had served as a vessel repair supervisor since 2005. Naquin's primary responsibility as a vessel repair supervisor was the maintenance and repair of EBI's fleet of lift-boat vessels. Ordinarily, Naquin worked aboard the lift-boats while they were moored, jacked up, or docked in EBI's shipyard canal. Naquin's spent approximately 70 percent of his total time working aboard these vessels, including inspecting them for repairs, cleaning them, painting them, replacing defective or damaged parts, performing engine repairs, going on test runs, securing equipment, and operating the vessel's marine cranes and jack-up legs. Two to three times per week, Naquin would do his work while the vessel was being moved to another position in the canal. Occasionally, EBI dispatched Naquin to repair a vessel or fill in as a vessel crane operator while the vessel was operating in open water. Naquin spent the remaining 30 percent of his time working in the shipyard's fabrication shop or operating the shipyard's LC-400 land-based crane.

On November 17, 2009, Naquin was using the shipyard crane, which had been designed and constructed by EBI, to relocate a test-block, a heavy iron weight used to test the lifting capacity of cranes. Although the test-block was well within the LC-400's rated capacity, the crane suddenly failed, causing the boom and crane house to separate from the crane pedestal. As the crane toppled

---

[1] A lift-boat is a self-propelled, self-elevating, offshore supply vessel. Although it functions and navigates much like any other supply vessel, a typical lift-boat is equipped with three column-like legs that can be quickly lowered to the seafloor to raise the vessel out of the water and stabilize it for marine operations.

No. 12-31258

over onto a nearby building, Naquin was able to jump from the crane house. However, he did not avoid injury; he sustained a broken left foot, a severely broken right foot, and a lower abdominal hernia. Naquin's cousin's husband, who happened to be another EBI employee, was working in the building and was crushed by the crane and killed. Naquin learned of his death while in the hospital after the accident, either later that same day or the next day.[2]

Following the accident, Naquin underwent one surgery for his hernia and one surgery to repair his right foot. Because Naquin's right foot was fractured in several places, a plate and screws were required to repair the damage. Despite Naquin's reparative surgeries and 70 physical therapy sessions, he was not able to return to physical work. EBI subsequently offered Naquin a "desk job" at the shipyard, but he declined, asserting that he was too emotionally upset to return to work. Although Naquin's medical treatment had ceased, at the time of trial, he continued to complain of chronic pain in his feet, difficulty walking, and chronic depression.

In November 2010, Naquin filed the instant Jones Act suit, alleging that EBI was negligent in the construction and/or maintenance of the LC-400 shipyard crane. After a three-day trial, a jury concluded that Naquin was a Jones Act seaman and that EBI's negligence caused his injury. The jury awarded Naquin $1,000,000 for past and future physical pain and suffering, $1,000,000 for past and future mental pain and suffering, and $400,000 for future lost wages. EBI immediately filed motions requesting a judgment as a matter of law, a new trial, a new trial on damages, and remittitur. The district court denied all of EBI's motions, and EBI now appeals.

---

[2] During his testimony on direct examination, Naquin stated that paramedics told him immediately after the accident that the workers in the building were "doing all right." He continued to say that he thought the information regarding their injuries, specifically the death of his cousin's husband, was kept from him "for [his] own good."

3

No. 12-31258

## II.

"The determination of whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact and it is usually inappropriate to take the question from the jury."[3] Accordingly, we will not disturb a jury's finding of seaman status unless the facts and the law do not "reasonably support" its conclusion.[4]

Conversely, the appropriate standard of review to test a jury's factual findings is whether there is "reasonable evidentiary basis for the jury's verdict."[5] We therefore review the evidence "in the light most favorable to the verdict. 'Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.'"[6] As always, conclusions of law are reviewed de novo.

## III.

On appeal, EBI challenges multiple legal conclusions and factual determinations of the district court. We now address, in order, EBI's contentions (1) that Naquin was not a Jones Act seaman, (2) that the district court provided the jury with erroneous seaman status instructions, (3) that the evidence is insufficient to establish EBI's negligence, and (4) that the district court erred by admitting evidence of Naquin's relative's death to support Naquin's emotional damages claim.

## A.

EBI first argues that the jury erred in its determination that Naquin was a seaman entitled to Jones Act coverage. Specifically, EBI argues that because

---

[3] *Becker v. Tidewater, Inc.*, 335 F.3d 376, 386 (5th Cir. 2003).

[4] *See id.*

[5] *See Loehr v. Offshore Logistics, Inc.*, 691 F.2d 758, 760 (5th Cir. 1982).

[6] *Huffman v. Union Pacific R.R.*, 675 F.3d 412, 425 (5th Cir. 2012) (citation omitted).

4

No. 12-31258

Naquin is a land-based ship-repairman, he is not connected to vessels in navigation and cannot qualify as a seaman.

In support of its argument that Naquin is not a seaman, EBI primarily argues that Naquin is a land-based repairman who performs classic land-based harbor worker duties. As EBI points out, the Jones Act's land-based worker counterpart, the Longshore and Harbor Worker's Compensation Act ("LHWCA") expressly identifies "ship repairm[e]n" as subject to its coverage.[7] Because the LHWCA and Jones Act are mutually exclusive compensation schemes, EBI argues, Naquin's coverage under the LHWCA precludes his coverage under the Jones Act.

A few years ago we agreed with EBI's position.[8] However, the Supreme Court rejected this position and overruled our decision in *Pizzotolo* in *Southwest Marine, Inc. v. Gizoni*.[9] There, the Court clarified that the Jones Act covers any worker who qualifies as a "seaman," without regard to whether a worker may also qualify for coverage under the LHWCA.[10] This is true even in the case where a worker's job is specifically identified for coverage under the LHWCA.[11] Thus, the fact that Naquin performed ship repair duties (identified as covered by the LHWCA) cannot distract us from the threshold inquiry: whether Naquin first qualifies as a seaman.[12]

---

[7]  *See* 33 U.S.C. § 902(3).

[8]  *See Pizzitolo v. Electro-Coal Transfer Corp.*, 812 F.2d 977, 982–84 (5th Cir. 1987).

[9]  502 U.S. 81, 87–88 (1991).

[10]  *See id.*

[11]  *See In re Endeavor Marine Inc.*, 234 F.3d 287, 291 (5th Cir. 2000).

[12]  *See id.* ("[E]ven a ship repairman (which is traditional longshoreman work and is one of the enumerated occupations under the LHWCA) may qualify for seaman status if he has the requisite employment-related connection to the vessel.").

No. 12-31258

Though the Jones Act does not define "seaman," Congress has elsewhere defined it as the "master or member of a crew of any vessel."[13] To determine if a worker is a seaman or member of a vessel's crew, the Supreme Court has established a two-prong test: "First, 'an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission.' Second, 'a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature.'"[14] Importantly, an individual can still qualify for seaman status even if he divides his time among multiple vessels under common ownership or control.[15] The relevant question is whether, in the course of his current job, he substantially contributes to the vessels' functions and maintains a substantial connection with the fleet.[16]

"[S]atisfying the first prong of the [seaman] test is relatively easy: the claimant need only show that he does the ship's work."[17] Under this standard, there can be little doubt that Naquin did the ship's work and contributed to the function of EBI's vessels. As EBI concedes, Naquin spent the majority of his time repairing, cleaning, painting, and maintaining the 26–30 lift-boat vessels that EBI operated out of the Houma shipyard. Moreover, the remainder of Naquin's hours aboard EBI lift-boats was spent operating the marine crane and securing

---

[13] *See Chandris v. Latsis*, 515 U.S. 347, 355–56 (1995); 33 U.S.C. § 902(3)(G).

[14] *Becker*, 335 F.3d at 387 (quoting *Chandris*, 515 U.S. at 368).

[15] *See Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 558 (1997).

[16] *See id.; Bertrand v. Int'l Mooring & Marine, Inc.*, 700 F.2d 240, 245–46 (5th Cir. 1983).

[17] *Becker*, 335 F.3d at 387–88 (internal quotation marks and citation omitted).

Case 2:10-cv-04320-CJB-KWR   Document 188   Filed 06/26/14   Page 9 of 30

No. 12-31258

the deck for voyage. Equipment operators and mechanics performing such tasks are necessary to the function and operation of any vessel.[18]

Turning to the second prong of the seaman test, Naquin is only eligible for Jones Act coverage if his connection to the EBI lift-boat fleet is "substantial in terms of both duration and nature."[19] As the Supreme Court has explained, the fundamental purpose of the substantial connection requirement is "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea."[20] Thus, a worker seeking seaman status must separately demonstrate that his connection to a vessel or fleet of vessels is, temporally, more than fleeting, and, substantively, more than incidental.[21] These inquiries are not always distinct, but are interrelated elements of the same substantial connection requirement.[22]

Weighing in on the durational aspect of the vessel-connection requirement, the Supreme Court has endorsed this Court's general rule of thumb: "A worker who spends less than about 30 percent of his time in the service of a vessel in

---

[18] *See, e.g., id.* at 388. *See also Endeavor Marine Inc.*, 234 F.3d at 291 (finding barge crane operator to be a seaman, because "even a ship repairman (which is traditional longshoreman work and is one of the enumerated occupations under the LHWCA) may qualify for seaman status if he has the requisite employment-related connection to the vessel."); *Boatel, Inc. v. Delamore*, 379 F.2d 850, 853–54, 859 (5th Cir. 1967) (finding diesel "motorman" to be a seaman); *and Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, 280 F.2d 523 (5th Cir. 1960) (finding ferry's maintenance superintendent to be a seaman).

[19] *See Chandris*, 515 U.S. at 368.

[20] *Id.*

[21] *See id.* at 369–71.

[22] *See id.*

No. 12-31258

navigation should not qualify as a seaman under the Jones Act."[23] "Indeed, application of the 30 percent test is the very means by which a substantial temporal connection is determined, regardless whether a single vessel or group of vessels is at issue."[24] In the instant case, Naquin spent approximately 70 percent of his time repairing and operating cranes and other equipment on EBI's fleet of lift-boats. The evidence therefore clearly supported the jury's implicit finding that Naquin had a connection to the EBI fleet that was substantial in terms of duration.[25]

Although vessel repair is classic seaman's work, EBI argues that Naquin does not qualify as a seaman because his duties do not "regularly expose[ him] to the perils of the sea."[26] The purpose of this requirement is to distinguish between land-based workers who do not face maritime dangers and the sea-based workers who do face those dangers.[27]

To support its argument that Naquin was not sufficiently exposed to maritime perils to merit seaman status, EBI emphasizes that Naquin was rarely required to spend the night aboard a vessel, that the vessels he worked upon were ordinarily docked, and that he almost never ventured beyond the immediate canal area or onto the open sea. However, courts have consistently rejected the categorical assertion that workers who spend their time aboard vessels near the shore do not face maritime perils. While these near-shore workers may face fewer risks, they still remain exposed to the perils of a

---

[23] See id. at 371.

[24] Roberts v. Cardinal Servs., Inc., 266 F.3d 368, 376 (5th Cir. 2011).

[25] See Endeavor Marine, 234 F.3d at 291.

[26] See id. at 292.

[27] See Papai, 520 U.S. at 560.

No. 12-31258

maritime work environment.[28] As the Supreme Court explained in *Stewart v. Dutra*:

> [I]t seems a stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic; but such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world.[29]

This court's decision in *Endeavor Marine* is particularly instructive. There, we considered whether a derrick barge crane operator had the requisite connection to a vessel that was substantial in terms of nature.[30] The crane operator worked exclusively on a stationary crane barge used to load and unload cargo at a Mississippi River dock facility.[31] He was rarely required to board a moving vessel and he never traveled beyond the immediate dock area.[32] Moreover, his primary job was to operate the crane on the barge and to repair and maintain the equipment on the barge.[33] The district court found the employee's connection to the barge was not substantial in nature because "it did not take him to sea. His work brought him aboard the barge only after the vessel

---

[28] *See Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497 (2005); *Endeavor Marine*, 234 F.3d at 291. *See also Grab v. Boh Bros. Constr. Co., L.L.C.*, 506 F. App'x 271, 276 (5th Cir. 2013) (unpublished) ("[T]he fact that [the injured employee] returned home daily did not remove him from his exposure to cognizable dangers of the sea.").

[29] 543 U.S. at 497 (internal citation omitted).

[30] 234 F.3d 287.

[31] *Id.* at 289.

[32] *Id.*

[33] *Id.* at 292 n.4.

was moored or in the process of mooring."[34] We reversed. Despite the fact that the crane operator was not literally "taken to sea" and did not face some of the maritime dangers faced by seamen on moving vessels in the open sea, we still concluded that he was regularly exposed to the perils of the sea and qualified as a seaman.[35]

We see no basis to distinguish *Endeavor Marine* from the instant case.[36] Like the crane operator in that case, Naquin's primary job duties were performed doing the ship's work on vessels docked or at anchor in navigable water. In doing this work, Naquin faced precisely the same type and degree of maritime perils faced by the port-bound derrick barge crane operator in *Endeavor Marine*. Additionally, we have dozens of cases finding oilfield workers and other "brown-water" workers on drilling barges and other vessels qualified as seamen even though they spent all their work time on these vessels submerged in quiet inland canals and waterways.[37] Accordingly, we conclude

---

[34] *Id.* at 291.

[35] *Id.* at 292.

[36] In *Endeavor Marine* the employee suffered his injury while working aboard a vessel, whereas Naquin was injured as he performed land-based duties. This distinction is not relevant to our analysis of whether Naquin qualifies as a Jones Act seaman because that inquiry is status-based, and does not focus solely upon the employee's activity at the time of the injury. *See Chandris*, 515 U.S. at 361 ("It is therefore well settled . . . that the Jones Act inquiry is fundamentally status based: Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel [or group of vessels] takes them ashore.").

[37] *See, e.g., Producers Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir. 1966) (employee performed maintenance work on submersible drilling barge in a navigable canal); *Colomb v. Texaco, Inc.*, 736 F.2d 218 (5th Cir. 1984) (employee worked aboard inland submersible barge at the end of a canal off inland waters which were eight feet deep); *Landry v. Amoco Production Co.*, 595 F.2d 1070 (5th Cir. 1979) (employee was a roustabout who worked aboard barges in inland waters and marshes); *Grab v. Boh Bros. Const. Co., LLC*, 506 F. App'x 271 (5th Cir. 2013) (per curiam) (unpublished) (employees worked aboard a crane barge in Lake Ponchartrain.

No. 12-31258

that Naquin's connection to the EBI vessel fleet was substantial in terms of nature.

The record demonstrates that Naquin contributes to the function of a discrete fleet of vessels and has a connection with the fleet that is substantial in terms of both duration and nature. We therefore hold that the evidence supports the jury's finding that Naquin is a seaman.[38]

## B.

EBI next argues that the district court abused its discretion by erroneously instructing the jury on the issue of seaman status. We apply a two-part test in considering a challenge to the district court's jury instructions: (1) First, the party challenging the instructions must "demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations; and (2) Second, even where a jury instruction was erroneous, "we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case."[39] EBI levels a very specific complaint against the district court's instruction: That the district court erred by presenting the two prongs of the seaman test in reverse order, by "garbling" the separate requirements of the test, and failing to emphasize that a seaman's connection to vessels must be substantial in terms of *nature*.

In the instant case, the district court charged the jury as follows:

Under the governing law the plaintiff is a seaman if he proves by a preponderance of the evidence the following: A, or first, that he has a connection to a vessel in navigation, or to an identifiable group of

---

[38] Because the jury's seaman status finding was supported by the evidence, it follows that the district court did not err in denying EBI's motions for summary judgment, judgment as a matter of law, or a new trial. *See* FED. R. CIV. PROC. 56(a).

[39] *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 293 (5th Cir. 2007) (internal citation omitted).

No. 12-31258

vessels, that is substantial in terms of both its duration and nature, and secondly that his duty contributed to the function of a vessel or identifiable group of vessels, or to the accomplishment of its mission.

Despite a reversal of the test's normal organization, the above instruction is wholly consistent with our own articulation of the seaman test.[40] After reviewing the relevant jury charge in its entirety, we do not agree that the charge was confusing or misleading. Quite the opposite, a careful review of the district court's explanation reveals a careful attempt to explain a difficult-to-define concept to a jury of laymen. The court's explanation points out that Naquin's connection to the EBI fleet is only substantial if it was "an actual, regular connection"; that the connection must be "more than a temporary or occasional connection"; and that the jury should "focus on the nature and location of [Naquin's] work." In fact, the court's instruction mirrors the Supreme Court's explanation of the seaman status test in *Chandris v. Latsis*.[41]

Because the district court's seaman status instruction was clear and consistent with the usual articulation, we conclude that the district court did not err in its instruction on the issue of seaman status.

## C.

EBI next argues that the evidence is insufficient to support the jury's finding of negligence. Specifically, EBI contends that it cannot be negligent because there is no evidence indicating that EBI caused or could have foreseen the accident.

The law of employer negligence is clear: Every employer has a duty to provide its employees with a reasonably safe work environment and work

---

[40] *See, e.g., Becker,* 335 F.3d at 387–88.

[41] 515 U.S. at 370–71.

equipment.[42] Because EBI designed, constructed, operated, and maintained the defective LC-400 crane which injured Naquin, EBI is liable if its negligent performance of any of those activities caused Naquin's injuries.

In this case, the testimony at trial established that the crane, which was manufactured by EBI, fell when the weld which bound the crane to its base failed. EBI's witness testified that the test block being moved by the crane was well within the rated capacity of the LC-400 crane. Although Naquin was unable to prove precisely why the weld failed, it is undisputed that EBI was the party who was responsible for the design of the crane and the integrity of the weld and who could have implemented more stringent weld safety standards. Relying upon this circumstantial evidence, the jury determined that EBI was negligent.

On appeal, EBI argues that the exclusive reliance upon circumstantial evidence in this case is essentially a dependence on the doctrine of *res ipsa loquitur*.[43] Because *res ipsa* was never specifically pled or asserted, EBI argues, the argument has been waived and Naquin cannot rely exclusively on the fact that EBI was responsible for the weld to establish its negligence.

This court considered this precise argument on nearly identical facts in *Watz v. Zapata Off-Shore Co.*[44] Sitting in admiralty, the *Watz* court considered whether a chain manufacturer had been negligent when a defective weld in the chain caused it to snap, injuring a shipyard worker below.[45] At a bench trial, the district court inferred from the defective weld that chain manufacturer was

---

[42] *See Strong v. B.P. Exploration & Prod., Inc.*, 440 F.3d 665, 669 (5th Cir. 2006).

[43] Under *res ipsa loquitur*, a jury is permitted to infer negligence on the part of the one who exercised control over an item where that item has caused the damage and other plausible explanations have been reasonably ruled out. *See Brown v. Olin Chem. Corp.*, 231 F.3d 197 (5th Cir. 2000).

[44] 431 F.2d 100 (5th Cir. 1970).

[45] *Id.* at 103.

No. 12-31258

negligent.[46] On appeal to this court, the chain manufacturer argued that the district court could not rely on what amounted to a theory of *res ipsa* when no such theory had been pled.[47] However, we rejected the chain manufacturer's contention, stating:

> Certainly [the plaintiff] bore the burden of proof to show Campbell's [(the chain manufacturer)] negligence. But once it was proved that a defective weld had occurred during the manufacture of the chain by Campbell, we believe that the district court sitting as a finder of fact could reasonably infer negligence from that circumstantial evidence. Campbell objects that the pleadings and evidence did not specifically raise the doctrine of *res ipsa loquitur* and the district court did not refer to it. The evidence credibly established that responsible chain manufacturers attempt to avoid defective welds in the knowledge that they are dangerous. The finder of fact could reasonably infer that a defective weld would ordinarily not occur in the absence of negligence. We see no reason to invoke the Latin phrase here. We simply apply a rule of circumstantial evidence, not changing the burden of proof or casting presumptions against the defendant.[48]

There is no basis on which to distinguish this case from the holding of *Watz*. EBI was the only party responsible for welding the LC-400 crane to its base, a weld which was indisputably defective and the direct cause of Naquin's injuries. We therefore hold that this evidence, though circumstantial, is sufficient to support the jury's finding of negligence.

---

[46] *Id.* at 119.

[47] *Id.*

[48] *Id.* EBI points out that its practice was to hire a third party to inspect and test crane welds, but that the records documenting who had inspected the instant crane had been destroyed by Hurricane Katrina. However, this does not distinguish the instant case from *Watz*, where the chain manufacturer similarly insisted that it had conducted tests on the defective chain but had destroyed the documentation in the ordinary course of business.

14

No. 12-31258

## D.

EBI next argues that the district court abused its discretion when it admitted evidence of the death of Naquin's cousin's husband ("the relative") because it found such evidence to be relevant to Naquin's claim for emotional damages. The relative was killed when the collapsing crane crushed part of the building in which he was working. Arguing that the relative's death was irrelevant to any of the issues at the trial, EBI filed a motion in limine to exclude any references to the death as prejudicial. The district court denied the motion, concluding that though potentially prejudicial, the evidence was relevant to Naquin's claims for emotional damages. At the trial, much of Naquin's claim for his emotional damages focused on his relative's death, and the jury ultimately awarded him $1,000,000 for past and future emotional suffering.

Because the death of Naquin's relative is unquestionably irrelevant to the issues of seaman status and EBI negligence, the only issue to which it might have been relevant is Naquin's emotional damages. However, the Jones Act does not indiscriminately permit compensation for emotional damages resulting from the death of another person.

In *Consolidated Rail Corp. v. Gottshall*,[49] the Supreme Court was called upon to determine the extent to which an employer is liable for emotional damages under the Federal Employers' Liability Act ("FELA").[50] The negligence provision of FELA is expressly incorporated into the Jones Act. Specifically, the *Gottshall* Court considered whether an employee could recover for emotional distress from his employer after witnessing a co-worker die due to the employer's negligence.[51] Recognizing that the emotional harm caused by an accident is

---

[49] 512 U.S. 532 (1994).

[50] 45 U.S.C. §§ 51–60.

[51] *Id.* at 536.

15

potentially limitless, the Court observed the need for limits on those who can recover such damages.[52] The Court then surveyed the common law on the issue, identifying three major limiting tests for evaluating claims of negligent infliction of emotional distress: (1) the "physical impact" test, which only permits recovery for emotional damages if the plaintiff sustains a physical impact; (2) the "zone of danger" test, which permits recovery if the plaintiff was physically impacted *or* within the zone of potential impact; and (3) the "relative bystander" test, which extends recovery to those in the zone of danger as well as close relatives of a victim who are physically near and who observe the injury.[53] Concluding that "FELA's central focus [is] on physical perils," the Court also recognized that "a near miss may be as frightening as a direct hit."[54] Therefore, the Court reasoned, the appropriate test for awarding emotional damages under FELA—and by extension, the Jones Act—is whether the plaintiff was in the "zone of danger."[55]

Turning to the instant case, there is no question that Naquin was in the zone of danger and may therefore claim damages for his emotional harm. However, we are still left with the question of whether Naquin may assert a claim for emotional harm arising from the injury *to his relative*. In other words, Naquin contends that a Jones Act plaintiff, once physically injured and entitled to emotional damages, is entitled to the full spectrum of emotional damages, including those arising from an injury to someone else.

Despite the simplistic appeal of Naquin's argument, there is no caselaw or reasoning to support it. Instead, the Supreme Court's discussion of emotional

---

[52] *Id.* at 546.

[53] *Id.* at 547–49.

[54] *Id.* at 547, 555 (internal citation omitted).

[55] *See id.* at 555.

No. 12-31258

damages in *Gottshall* emphasizes the limited scope of damages available to individuals within the zone of danger: the emotional harm suffered from being physically injured or the emotional harm suffered from *almost* being physically injured.[56] As described by the Supreme Court, the zone of danger test allows a Jones Act plaintiff "to recover for emotional injury caused by *fear of physical injury to himself*."[57] More tellingly, the *Gottshall* Court explicitly rejected the relative bystander test, which would have permitted certain relatives to recover for emotional damages caused by witnessing an injury to someone else.[58] As our own court has previously recognized, it would be a "major departure from the existing jurisprudence" to "allow recovery for injuries resulting not from physical trauma, or the fear of physical trauma, to the plaintiff but from witnessing a 'bad sight,' *i.e.*, harm to another."[59]

Several other considerations bolster this conclusion. If multiple people witness an injury to someone else, it would be arbitrary to award emotional damages for seeing that person's injury only to those people who also happened to suffer an injury at the same time. Moreover, the Jones Act only extends an action to recover for the death of a seaman to his immediate family.[60] It would thus be inconsistent with the Jones Act's wrongful death provision to permit anyone else to recover for the negligent death of a coworker.

---

[56] *Id.* at 555–56.

[57] *Id.* at 556 (emphasis added).

[58] Even if the Supreme Court had adopted the "relative bystander" test, that test ordinarily requires a relationship closer than that of victim's spouse's cousin. *See, e.g.*, LA. CIV. CODE art. 2315.6 (limiting bystander emotional damage claims to a spouse, child, grandchild, parent, sibling, or grandparent).

[59] *See Plaisance v. Texaco, Inc.*, 966 F.2d 166, 169 (5th Cir. 1992) (en banc).

[60] *See* 45 U.S.C. § 51.

17

No. 12-31258

This conclusion is also most consistent with this court's decision in *Gaston v. Flowers Transp.*[61] In that case, we rejected an emotional damage claim by a Jones Act plaintiff who watched his half-brother get crushed to death between two vessels.[62] Although the *Gaston* plaintiff had not been physically injured, we nonetheless distinguished between plaintiffs who suffer emotional harm from an event "directly affecting *him*" and plaintiffs who suffer harm from "witnessing the death of *another*."[63] We finally concluded, "whatever merit allowing recovery for purely emotional injury may have or may lack, we see none in allowing mere crewmen-bystanders to recover for witnessing the misfortune of another."[64]

The Supreme Court's decision in *Gottshall* and our own reasoning in similar cases compel us to conclude that emotional damages resulting purely from another person's injury, and not a fear of injury to one's self, are not compensable under the Jones Act. Such is the case even when the plaintiff has also been injured. To award damages for observing a "bad sight," even one which involves a family member, would contravene the zone of danger test's intent to compensate for physical dangers. Accordingly, we hold that Naquin's emotional damages arising from the death of his relative are not compensable under the Jones Act and the evidence regarding those damages should have been excluded from the trial.

Because we cannot discern to what extent Naquin's $1,000,000 award for emotional suffering was based upon the non-compensable harm caused by the

---

[61] 866 F.2d 816 (5th Cir. 1989).

[62] *Id.* at 819–21.

[63] *Id.* at 819.

[64] *Id.* at 821. *See also Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 225 (5th Cir. 2013) (finding that, because platform worker who was present when co-worker fell to his death was not "in immediate risk of physical harm," he was not entitled to emotional damages).

18

No. 12-31258

relative's death, the emotional portion of his damages is tainted.[65] Moreover, most reported decisions do not distinguish between physical and emotional pain and suffering awards,[66] so we cannot utilize our usual comparative framework for evaluating the reasonableness of Naquin's *physical* damage award in isolation.[67] The record also reveals that counsel for Naquin in his closing argument leaned heavily on the emotional damages Naquin suffered as a result

---

[65] EBI also complains that the jury erred by awarding mental anguish damages to Naquin for his depression despite the lack of corroborating medical testimony. "Any award for emotional injury greater than nominal damages must be supported by evidence of the character and severity of the injury to the plaintiff's emotional well-being." *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002). Nonetheless, we have also previously recognized our unwillingness to "hold that medical evidence or corroborating testimony is always required for an award of mental anguish damages." *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998). Instead, where a plaintiff's mental anguish testimony is corroborated by other witnesses, circumstances, and facts, we do not necessarily require expert medical testimony. *See id.* Although no expert testified concerning Naquin's depression, Naquin's own testimony regarding his mental anguish was supported by the testimony of his wife, his visits to doctors and social workers, and his prescription use of an anti-depressant drug following the accident.

[66] *See, e.g., Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1427 (5th Cir. 1988); *Bernard v. United States*, 794 F. Supp. 608, 611 (E.D. La. 1991); *Aucoin v. State through Dep't of Transp. and Dev.*, 712 So.2d 62 (La. 1998).

[67] Under this circuit's "maximum recovery rule," we will uphold a jury award if there is a damage award in at least one "factually similar case from the relevant jurisdiction" that, when increased by 50%, equals or exceeds the challenged jury award. *See Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003).

of his relative's death.[68] Because Naquin's lost wages claim is also founded partially upon his non-compensable emotional injury, it too is tainted.[69]

Even putting these concerns aside, serious practical problems would be presented at trial if we were to save some elements of the damage award and retry only other elements of damage. "[W]here, as here, the jury's findings on questions relating to liability were based on sufficient evidence and made in accordance with law, it [i]s proper to order a new trial only as to damages."[70] We therefore retain the jury's liability finding but order a new trial on damages.[71]

---

[68] During his closing argument, counsel for Naquin said the following regarding Naquin's emotional damages due to the death of his relative:

. . . He has tremendous issues because of [the accident]. I don't know that you could write anything more horrific than killing one of your relatives in an accident. You know, I hope Larry gets a lot out of that.

I think when you assign a value to that, I think one thing you're signalling (sic) to him is whether you've understood it or not. I don't know how you put a value on a person's well-being mentally. I don't know how you sit down and try to get your head around someone who is actually going to kill themselves. That is extremely hard.

I would suggest one comparison again to his past wages and future wages. If that little $550,000 is what his pocketbook is hurt, then what can you imagine his mind has been through and his experiences have been hurt. I would suggest, again, two to three times that is very fair for this man. Some of you may feel that's a low figure. You may think who is this lawyer who is trivializing what this man has been through. That's up for you all to decide.

[69] Naquin's claim for future lost wages stems solely from his inability to accept EBI's offer of sedentary work due to his continuing emotional distress. However, the lost wage consequences of Naquin's emotional distress are only compensable to the extent his distress is compensable. Because a substantial portion of his emotional damages are based upon non-compensable emotional distress arising from the death of his relative, future wages lost because of that non-compensable emotional distress are likewise non-compensable.

As the issue has been raised by EBI, we separately note the proper work-life expectancy basis for calculating future lost wages on remand: "It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average. Absent such evidence, however, computations should be based on the statistical average." *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984).

[70] *Hadra v. Herman Blum Consulting Engineers*, 632 F.2d 1242, 1246 (5th Cir. 1980).

[71] Because we remand the case for a new trial on damages, we need not consider EBI's final point of error, which alleges that the jury's emotional damage award was tainted by an

No. 12-31258

IV.

For the reasons stated above, we AFFIRM the judgment of the district court as it relates to liability, but VACATE the judgment of the district court as it relates to damages and REMAND for proceedings consistent with this opinion.

AFFIRMED in part, VACATED and REMANDED in part.

---

inadvertent discussion of previously-excluded testimony.

No. 12-31258

JONES, Circuit Judge, dissenting.

I concur in all of this good opinion except the decision affirming Naquin's status as a seaman. On this issue, I respectfully disagree.

## I.  Seaman Status Elements

To be a seaman, Naquin must satisfy the two-prong test established in *Chandris v. Latsis*: (1) his duties must contribute to the function of the vessel or to the accomplishment of its mission; and (2) he must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature.  *Chandris v. Latsis*, 515 U.S. 347, 368 (1997).  I agree with the majority that Naquin passes the first prong of the *Chandris* test.  In my view, however, Naquin does not satisfy the duration or nature components of *Chandris*'s second prong. Indeed, if a jury could hold Naquin is a seaman, then it could so conclude as to any shore-based worker who maintained EBI's on-board computers or went aboard the lift-boats to gas them up before they left the repair yard. *Chandris* and *Sw. Marine, Inc. v. Gizoni*, 502 U.S. 81 (1991), broadly commit these cases to the jury, but they do not prevent courts from ever distinguishing seamen from harbor workers as a matter of law.

## II.  Duration Component

As a general rule, the duration component of *Chandris*'s second prong is satisfied when an employee spends 30 percent or more of his time in service of a "vessel in navigation." *Chandris*, 515 U.S. at 371.  (The Supreme Court adopted this circuit's opinion in *Barrett v. Chevron, U.S.A.*, 781 F.2d 1067 (5th Cir. 1986) (en banc) on this rule of thumb.)  But the Court noted,

> This figure [30%] serves as no more than a guideline . . . and departure from it will certainly be justified in appropriate

22

No. 12-31258

cases . . . . And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury . . . .

*Chandris*, 515 U.S. at 371.

The sole issue here is whether Naquin's work as a repair supervisor on vessels docked in a canal or in drydock counts as service of a vessel in navigation. Naquin spent 70 percent of his time employed in this capacity.[1] In denying EBI's motion for summary judgment, the district court took a statement from *Chandris* out of context to reach a conclusion that runs contrary to the "fundamental distinction" that *Chandris* recognized between land-based and sea-based maritime workers. *Cf. id.* at 358. According to the district court, Naquin's land-based repair time was connected to a vessel in navigation because, as *Chandris* noted, a vessel remains in navigation even when it is temporarily moored or docked for repairs. *Naquin v. Elevating Boats, LLC*, 842 F. Supp. 2d 1008, 1017 (E.D. La. 2012) (citing *Chandris*, 515 U.S. at 373-74). The majority concludes without further discussion that Naquin's time repairing the lift-boat cranes satisfies the duration component.

In my view, this conclusion is irreconcilable with *Chandris*'s "basic point," which is that land-based employees like Naquin are not seamen. *Chandris*, 515 U.S. at 370 ("The Jones Act remedy is reserved for *sea-based* maritime employees whose work regularly exposes them [to maritime peril]" . . . . [T]he ultimate inquiry is whether the worker in question is a member of the vessel's crew or *simply a land-based employee*.") (emphasis added); *see also Heise v. Fishing Co. of Alaska*, 79 F.3d 903, 906 (9th Cir. 1996) (holding that a land-based repairman assigned to perform routine, off-season

---

[1] The rest of Naquin's hours were not connected with a vessel in navigation. He divided nearly all of his remaining time between the fabrication shop and operating a land-based crane in the shipyard.

23

No. 12-31258

maintenance on a fishing vessel did not satisfy *Chandris*'s first prong where the "first basic principle" behind *Chandris*'s definition of seaman is that the term does "not include land-based workers"). Moreover, the passage in *Chandris* regarding temporarily moored or docked vessels is inapplicable to the present facts. Unlike the plaintiff in *Chandris*, Naquin did not sail on a ship that was temporarily docked. He worked almost exclusively on vessels that were moored, jacked up, or docked in the shipyard undergoing repair, and found himself on a navigable vessel only on rare occasions.[2] To allow Naquin to accrue the 30 percent minimum temporal connection while solely working on docked vessels under repair essentially removes the duration component for other land-based repairmen who are fortunate enough to work on vessels that do not require long-term repairs. According to the majority, these repairmen could always claim that they spent their time working on vessels "in navigation" despite the fact they do all of their work on or tied to land, safely removed from maritime dangers. To me, this outcome defies logic and disregards the overarching purpose of the Jones Act as stated in *Chandris*.

## III.  Nature Component

I also disagree with the majority's analysis of the nature component of *Chandris*'s second prong. The majority characterizes the facts that support the conclusion that Naquin spent all of his time dockside as a "categorical assertion" that does not demonstrate that Naquin was protected from maritime perils. But in the next sentence, the majority categorically asserts that near-shore workers "still remain exposed to the perils of the sea," citing no facts showing that Naquin, who spent nearly all of his time on boats

---

[2] Naquin testified that he was aboard on a moving vessel less than one percent of his time at work.

24

No. 12-31258

*moored to a dock*, faced any maritime perils in the ordinary course of his duties. This "moving right along" approach to the particulars of Naquin's employment runs contrary to the fact-specific inquiry that the Supreme Court has recommended for determining seaman status. *See, e.g., McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991) (holding that Jones Act status turns on the employee's "precise relation" to the vessel).

The majority then references several cases to support Naquin's claim to seaman's status, but they have no bearing on what circumstances, if any, entitle a dockside worker like Naquin to Jones Act coverage. The sole issue in *Stewart v. Dutra Constr. Co.* was whether the dredge was a vessel for the purposes of the Jones Act. The court did not address whether the harbor-bound worker, much less the land-based repair supervisor suing in our case, faced maritime peril. *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 485 (2005). Similarly, the dispositive factor in *Grab v. Boh Bros. Constr. Co., L.L.C.*, was not that the workers operated near the shore but that their work exposed them to sea-related dangers. The plaintiffs travelled daily to their worksite by crewboat and helped navigate a barge, which routinely had to be moved along the length of the Lake Pontchartrain bridge. *Grab v. Boh Bros. Constr. Co., L.L.C*, 506 F. App'x 271, 274, 276 (5th Cir. 2013). Naquin's shore-side duties exposed him to no such maritime perils.

In my view, the majority also misapplies *Endeavor Marine*. In that case, the district court held that plaintiff was not a seaman under *Harbor Tug and Barge Co. v. Papai* because his job did not literally "take him to sea." *In re Endeavor Marine Inc.*, 234 F.3d 287, 289 (5th Cir. 2000) (per curiam). We reversed, holding that the "going to sea" requirement is satisfied whenever the employee's connection to the vessel regularly exposes him to maritime

25

No. 12-31258

perils. *Id.* at 291. Further, we ruled that the plaintiff faced such perils. *Id.* at 292. The contrast between the work performed by the *Endeavor Marine* plaintiff and Naquin, however, seems clear. The *Endeavor Marine* plaintiff was a derrick barge crane operator who loaded and unloaded cargo vessels *in the Mississippi River* (not a canal). *Id.* at 288. His job required him to travel over water to his worksite and exposed him to the uniquely maritime dangers that arose when his barge was moored to the cargo vessels that he was assigned to load or unload. *Id.* at 289. He was injured, moreover, when struck by a mooring cable as he was handling the lines while waiting for his barge to be positioned alongside the cargo vessel. *Id.* Naquin, on the other hand, spent nearly all of his time dockside, repairing boats that were secured in the shipyard canal, or operating a land-based crane, or working in the shipyard fabrication shop. His employment, in sum, was substantially similar to that of other land-based employees whose seaman status has been denied by federal and state courts.[3]

Finally, the majority refers to our "brown water" cases to show that employees who work on quiet waterways may recover under the Jones Act. All of these cases, however, involve employees who performed their work

---

[3] *See, e.g., Clark v. Am. Marine & Salvage, LLC*, 494 Fed. App'x 32 (11th Cir. 2012) (unpublished) (affirming dismissal of Jones Act claim brought by crane operator who performed most of his repairs on land); *Schultz v. Louisiana Dock Co.* 94 F. Supp. 2d 746 (E.D. La. 2000) (ruling that repairman who inspected and repaired moored barges was not a seaman); *Richard v. Mike Hooks, Inc.*, 799 So.2d 462 (La. 2001) (reversing lower courts and dismissing land-based repairman's Jones Act claim).

No.  12-31258

while their vessel was operating on water.[4]   Thus, they offer no help to Naquin, who worked nearly always in the shipyard.

## IV.  Conclusion

With all respect to the majority, I would hold that Naquin is not entitled to seaman status and, therefore, reverse the district court's ruling that EBI was liable under the Jones Act.

---

[4] *See Producers Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir. 1966) (affirming seaman status where employee worked on barge that traveled through navigable waters); *Colomb v. Texaco, Inc.*, 736 F.2d 218 (5th Cir. 1984) (holding that oilfield worker assigned to inland, submersible barge was a seaman); *Landry v. Amoco Production Co.*, 595 F.2d 1070 (5th Cir. 1979) (providing that worker employed as roustabout aboard barges on inland waters is a seaman); *Boh Bros. Const. Co., LLC, supra* (ruling that employees who worked aboard a crane barge on Lake Ponchartrain were seamen).

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 20, 2014

Mr. William W. Blevins
Eastern District of Louisiana, New Orleans
United States District Court
500 Poydras Street
Room C-151
New Orleans, LA 70130

No. 12-31258   Larry Naquin, Sr. v. Elevating Boats, L.L.C.
USDC No. 2:10-CV-4320

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Dawn D. Victoriano, Deputy Clerk
504-310-7717

cc w/encl:
        Honorable Carl J. Barbier
        Mr. Jonathan Holden Adams
        Mr. Laurence Edward Best
        Mr. Travis Louis Bourgeois
        Mr. William Scarth Clark
        Mr. Sidney W. Degan III
        Mr. Peter S. Koeppel
        Mr. Foster P. Nash III
        Mr. John Peyton Randolph II
        Mr. Chet D. Traylor
        Mr. Timothy John Young